**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

EUGENE ELLIOT,

      Plaintiff-Appellee,

v.

TURNER CONSTRUCTION COMPANY, a
New York corporation; B&C STEEL, INC., a
Colorado corporation,

      Defendants-Appellants,

and

BUD BOYD,

      Defendant.

No. 03-1209

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 01-MK-1691 (OES))**

Peter H. Doherty, Overturf & McGath, P.C., Denver, Colorado, for the defendants-
appellants.

Diane Vaskdal Smith (Holly Baer Kammerer with her on the brief), Burg Simpson
Eldredge Hersh & Jardine, P.C., Englewood, Colorado, for the plaintiff-appellee.

Before **SEYMOUR**, **BRISCOE**, Circuit Judges, and **PAYNE**, Chief District Judge.[1]

_____

**BRISCOE**, Circuit Judge.

_____

In this diversity action, defendants Turner Construction Company and B&C Steel, Inc., appeal a jury verdict finding them negligent and awarding plaintiff Eugene Elliot damages for personal injuries he suffered while assisting in the launch of a pedestrian bridge. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm in part and reverse in part.

## I.

Turner Construction was hired as the general contractor for construction of Invesco Field at Mile High Stadium in Denver, Colorado. As part of the construction, the company was required to place a temporary pedestrian bridge across the Platte River to accommodate pedestrian traffic. Turner Construction entered into a rental agreement with Mabey Bridge and Shore for the component parts for the bridge. Mabey agreed to provide a site demonstrator (Elliot) for three days during construction of the bridge. Turner Construction also subcontracted with B&C to construct and launch the bridge.

As site demonstrator for the project, Elliot testified that his job responsibilities included:

_____

[1] Honorable James H. Payne, Chief District Judge, Eastern District of Oklahoma, sitting by designation.

go[ing] to a job site . . .and show[ing] the contractor basically how the bridge was put together, how a launch . . . was enacted, what equipment is suggested as far as what you would use to push or launch the bridge with, making sure that the bridge is put together correctly, mak[ing] sure that all the bolts are tight and sort of an inspector, basically.

App. II at 226-27. He testified that prior to a typical job, he would "prep" the contractors on the tools and equipment needed and make sure "everybody had everything together." Id. at 227. Additionally, he would go to the site and demonstrate how to correctly build and launch the bridge, and discuss which launch method should be used for the bridge in question. As his job responsibilities suggest, Elliot's function was in part as a consultant and in part as an inspector. He testified that as the panels were hooked together, he "would climb up and down throughout the bridge, checking and making sure that all th[e] pins had the retaining clips on, all the bolts were tightened, all the pieces were in the right place facing the right way, not upside down, or so on." Id. at 280. He stated that "thorough inspection was [his] job" and that, in the hours before the launch, he inspected the bridge again and held a pre-launch meeting to "let everybody know what to expect and what's going to go on." Id. at 281-82.

Other workers corroborated Elliot's testimony regarding his job responsibilities. John Goodrich, the project superintendent on the Invesco Field construction, testified it was his "understanding that Mr. Elliot was there to help direct the erection of the bridge, of putting the parts and pieces together." App. III at 549. According to Goodrich, Elliot "was there to assure that the quality of the bridge being put together was up to Mabey

3

Bridge's standards, and he offered help and advice to the actual iron workers that put the pieces and parts together." Id. Similarly, William Farmer, B&C's foreman iron worker in charge of overseeing assembly of the bridge for B&C, testified that during the week of the launch, Elliot "observed us working and ma[de] sure we were doing it right, putting it together." Id. at 586.

The bridge was launched on August 7, 1999. It was decided that a crane-assisted launch would be employed. Under this procedure, the bridge is constructed in one complete unit. Rollers are placed on the edge of the launching side and the bridge is pushed 40-45 percent across the water. Just before the point where the bridge's weight would cause it to tip into the water, a crane on the other side of the river lifts the front of the bridge and pulls it across while a bulldozer pushes the bridge from the launching side. When the bridge is nearly across the river, it is lifted from the rollers and set down.

When the launch began, Elliot was on the side of the river where the bridge was launched. The bridge was suspended in air over the river with a crane on the other side of the river attached to a corner of the bridge by a nylon strap. Elliot observed that the retaining wall which was supporting the crane on the other side of the river was beginning to collapse, causing the crane to begin to tip sideways. He saw Bud Boyd, owner of B&C, standing between the crane and the bridge, attempting to remove the nylon strap attached to the corner of the bridge. At this time, the bridge was about twenty feet across the water and four feet in the air. Elliot was concerned that if Boyd removed the nylon

4

strap, the bridge would fall into the water. Elliot decided to walk across the bridge to tell Boyd to stop. When he was on top of the bridge, he gave "the OSHA all-stop signal, not to move anything," id. at 294, but the bridge moved and Elliot fell. As a result, Elliot sustained numerous pelvic injuries, including a severed urethra.

Elliot filed a negligence action against Turner and B&C in Colorado state court alleging negligence and negligent supervision, and seeking damages.[2] Turner and B&C removed the action to federal court. B&C moved for summary judgment arguing it owed no duty to Elliot because it was not foreseeable that Elliot would walk across the bridge as it was being moved by the crane. Turner also moved for summary judgment claiming Elliot's claims were barred by the Colorado worker's compensation act because Turner was a "statutory employer" as defined in Colo. Rev. Stat. § 8-41-401(1)(a). The court denied both motions for summary judgment and the case proceeded to a jury trial. The jury returned a verdict for Elliot against Turner Construction and B&C, finding damages in the amount of $28,166.30 for economic losses, $1,195,364 for non-economic injuries, and $1,195,364 for permanent impairment. The jury found that each party – Turner Construction, B&C, and Elliot – bore 33.3 percent of the fault. Turner renewed its motion for judgment as a matter of law and filed a separate motion for new trial. B&C filed a motion for judgment as a matter of law, or in the alternative, for reconsideration of the court's denial of its motion for summary judgment. The district court denied the

_____

[2] Elliot also filed suit against Bud Boyd, but that claim was dismissed before trial.

5

motions and entered judgment against defendants, requiring each to pay $1,033.863.07.

## II.

In a diversity action, we apply the substantive laws of the forum state, including its choice of law rules. New York Life Ins. Co. v. K N Energy, Inc., 80 F.3d 405, 409 (10th Cir. 1996). Here, the forum state was Colorado. Under Colorado's choice of law rules, the law of the state with the most significant relationship to the claims will be used. Morgan v. United Air Lines, Inc., 750 F. Supp. 1046, 1054 (D. Colo. 1990). Applying these principles, the parties do not dispute that Colorado law applies to Elliot's tort claims.

*"Statutory employer" status under Colorado law*

Turner Construction contends it was Elliot's "statutory employer," as defined by Colo. Rev. Stat. § 8-41-401(1), and was therefore immune from suit. The determination of whether a person or entity is a statutory employer is a question of fact. Virginians Heritage Square Co. v. Smith, 808 P.2d 366, 368 (Colo. Ct. App. 1991). However, whether a legal conclusion based upon undisputed facts is correct is a matter of law. Id. This court reviews de novo a trial court's determination of state law. Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).

The primary purpose of the Colorado workers' compensation act "is to provide a remedy for job-related injuries, without regard to fault." Finlay v. Storage Tech. Corp., 764 P.2d 62, 63 (Colo. 1988). Through an interrelated set of provisions, "[t]he statutory

6

scheme grants an injured employee compensation from the employer without regard to negligence and, in return, the responsible employer is granted immunity from common-law negligence liability." Id. To be afforded this immunity, an employer must be a "statutory employer" as defined by the act. Id. Section 8-41-401(1)(a) provides the starting point for determining whether a party qualifies as a "statutory employer":

> Any person, company, or corporation operating or engaged in or conducting any business by leasing or contracting out any part of all of the work thereof to any lessee, sublessee, contractor, or subcontractor . . .shall be construed to be an employer as defined in articles 40 to 47 of this title and shall be liable . . . to pay compensation for injury or death resulting therefrom to said lessees, sublessees, contractors, and subcontractors and their employees or employees' dependents.

Colo. Rev. Stat. § 8-41-401(1)(a). Relying on this language, the district court concluded that Turner Construction was not a statutory employer because it did "not fall within Section 8-41-401 with regard to its dealings with Mabey." App. IV at 748. The court read the statute as only covering those situations where Mabey was a "lessee, sublessee, contractor, or subcontractor." Id. at 749. The court found that Mabey leased the temporary pedestrian bridge to Turner Construction and, therefore, was "a lessor to Turner, not a lessee from Turner." Id. at 748. The court reasoned that, because the statutory employer definition does not extend to those circumstances where the employee of a lessor is injured, Turner Construction was not a statutory employer. As a result, the court permitted Elliot's tort suit to proceed against Turner Construction.

On appeal, Turner Construction contends the district court erred in its overly strict

7

reading of § 8-41-401(1)(a) and should have focused instead on the actual employer-employee relationship between Turner Construction and Elliot. Under Colorado law, "the test for whether an alleged employer is a 'statutory employer' . . . is whether the work contracted out is part of the employer's 'regular business' as defined by its total business operation." Finlay, 764 P.2d at 67. This test is satisfied "where the disputed services are such a regular part of the statutory employer's business that absent the contractor's services, they would of necessity be provided by the employer's own employees." Id. at 66. In determining whether this test is met, "courts should consider the elements of routineness, regularity, and the importance of the contracted service to the regular business of the employer." Id. at 67.

In analyzing statutory employer status, courts have been guided by Colorado's "long-recognized rule that [the workers' compensation act] is to be liberally construed to accomplish its humanitarian purpose of assisting injured workers and their families." Garner v. Vanadium Corp. of America, 572 P.2d 1205, 1206-07 (Colo. 1977); see also Stewart v. United States, 716 F.2d 755, 763 (10th Cir. 1982). Thus, courts have liberally construed the workers' compensation act to find statutory employer status in a wide variety of cases and have not made the determination a function of whether the equipment accompanying the plaintiff was leased to the defendant-employer. See, e.g., San Isabel Elec. Ass'n, Inc. v. Bramer, 510 P.2d 438, 440 (Colo. 1973) (holding employee of aircraft service under contract to make aerial inspection trips of power lines was statutory

8

employee of electric association); <u>Pioneer Constr. Co. v. Davis</u>, 381 P.2d 22, 24 (Colo.

1963) (noting when plaintiff leased a truck and attending driver, it became statutory

employer of the driver while driver was on duty and driving the truck); <u>Rowan v. Vail

Holdings, Inc.</u>, 31 F. Supp. 2d 889, 907 (D. Colo. 1998) (holding ski manufacturer was

skier's statutory employer when skier was killed while testing skis for manufacturer's

subsidiary because, absent employing the skier, the manufacturer would have to hire its

own employee to test the skis).  Instead, the approach has been to find that a party is a

statutory employer and thus required to pay workers' compensation to the downstream

injured employee as long as the employee's services are necessary and routine to the

employer's regular business.  <u>See</u> <u>Buzard v. Super Walls, Inc.</u>, 681 P.2d 520 (Colo.

1984).

Turning to the case at bar, we conclude the district court erred when it concluded

Turner Construction was not Elliot's statutory employer.  First, we do not read the text of

the statute, when applied to the employment relationship at issue here, as barring the

conclusion that Turner Construction was Elliot's statutory employer.  The district court

unduly emphasized the fact that Mabey leased the bridge to Turner Construction and

permitted this fact to control its analysis of Turner Construction's legal relationship with

Elliot.  Mabey was a lessor with respect to the component parts of the bridge, but a

subcontractor to the extent it assisted Turner Construction/B&C (through Elliot) in

constructing and launching the bridge.  Employees of subcontractors are explicitly

9

covered by the act.

Second, under Colorado law, we are required to apply the test set forth in Finlay to determine whether the work Turner Construction contracted to Mabey's employees was part of Turner Construction's regular business as defined by its total business operation. We are cognizant of the fact that its regular business did not include fabricating temporary pedestrian bridges. However, as Elliot concedes, "[t]here is no question that erecting bridges is a regular part of Turner's business." Aple. Br. at 9. It was not unusual for a major construction company involved in a large project to need employees with expertise in bridge assembly and construction. See Finlay, 764 P.2d 62 (stating a computer company normally would need cleaning services); Melody Homes, Inc. v. Lay, 610 P.2d 1081 (Colo. Ct. App. 1980) (stating a construction site normally would need security). Stated another way, absent Elliot's expertise and assistance, Turner Construction would have had to hire its own employee to study the bridge's design and assembly and advise and oversee its construction and launch.

Finally, we decline to adopt the district court's interpretation of § 8-41-401(1)(a) because such an interpretation would be contrary to a liberal construction of workers' compensation laws to provide workers' compensation coverage. See Finlay, 764 P.2d at 67 (stating statutory employer statute should not be interpreted to "bar the recovery of an injured worker who is unable to show negligence and whose primary employer is uninsured and financially irresponsible"). We conclude Turner Construction was Elliot's

10

statutory employer and, thus, was immune from suit.

As Turner Construction is immune from suit, the remaining issues, which both Turner and B&C have raised, are now relevant only to B&C. B&C contends that the district court erred (1) in admitting evidence of B&C's miscues leading up to the launch of the bridge; (2) in including a sudden emergency instruction; and (3) in concluding B&C owed a duty of care to Elliot and that his injuries were foreseeable.[3]

*Prior bad acts evidence*

B&C contends the district court erred in relying on Federal Rules of Evidence 404(b) and 403 to introduce evidence of B&C's mistakes preceding the launch of the bridge. We review a district court's ruling on the admissibility of evidence for an abuse of discretion. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003). Under this standard, we will not reverse a trial court's evidentiary rulings unless we are convinced the district court "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances" and the complaining party's rights were adversely affected. Pandit v. American Honda Motor Co., 82 F.3d 376, 379 (10th Cir. 1996).

---

[3] Turner's immunity from suit does not necessitate a new trial because we have no reason to believe that either the presentation of proof or the jury instructions would be any different. Colorado's pro rata liability statute, Colo. Rev. Stat. § 13-21-111.5, provides that, in civil actions based on claims of negligence, plaintiffs and defendants may designate nonparties as wholly or partially negligent, and authorizes the finder of fact to consider the percentage of a nonparty's negligence in apportioning ultimate liability.

Over B&C's objections, the district court relied on Rule 404(b) to admit evidence tending to show that: (1) B&C's trucks carrying the bridge parts were not unloaded where the bridge was to be assembled; (2) B&C's poor planning resulted in several problems in moving the bridge closer to the water, including failure to note the location of a fence, concrete guardrails, and a set of trolley tracks in the bridge's path; (3) B&C personnel initially assembled the bridge upside down; (4) a B&C truck hit a power wire causing a small fire which required the fire department's response; and (5) B&C did not arrange for the power lines to be disabled before the bridge was moved beneath them. The district court ruled this evidence was admissible under Rule 404(b) because it tended to establish "a pattern of negligence [in constructing and assembling the bridge] from the time that the bridge was received until the time it was installed." App. II at 254.

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." As a prerequisite to Rule 404(b)'s application, a party must seek to exclude evidence *extrinsic* to the plaintiff's claim. United States v. O'Brien, 131 F.3d 1428, 1432 (10th Cir. 1997). Evidence is extrinsic if it involves an act wholly apart from and not intricately related to the asserted claim. See United States v. Elder, 16 F.3d 733, 737 (7th Cir. 1994) (noting "[f]or evidence of prior bad acts to be subject to the admissibility requirements of Rule 404(b), they must at the very least be 'other acts' not intricately related to the charged offense"). Conversely, evidence is *direct or intrinsic* to the plaintiff's claim if it is part of

12

the same tortious event.  See United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993) (explaining in the criminal context that evidence is direct or intrinsic to the crime charged if "both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged"); United States v. Masters, 622 F.2d 83, 86 (10th Cir. 1980) (stating evidence is admissible when necessary to a full presentation of case).

We conclude the district court properly admitted the challenged evidence, but we disagree with the rationale it provided.  Rule 404(b) is inapplicable here because the evidence at issue was directly related to Elliot's negligence claim against B&C and was offered to prove the central theory of plaintiff's case: "the unpreparedness of the defendant B&C Steel for the project and their lack of planning for it."  App. II at 253. The evidence was therefore not only intrinsic to Elliot's negligence claim, but was essential to portraying the events leading up to his injury.

B&C also contends the district court should have excluded the challenged evidence under Rule 403 because "its probative value [wa]s substantially outweighed by the danger of unfair prejudice" to B&C.  Fed. R. Evid. 403.  Unfair prejudice in the context of Rule 403 "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 cmt. n.  We conclude the district court did not abuse its discretion in refusing to exclude this evidence under Rule 403.  Although the possibility of prejudice to B&C no doubt existed, that prejudice was not so overwhelming as to trump the relevance of this evidence which was

central to proving Elliot's theory that B&C and Turner Construction were ill prepared for the launch.

*Sudden Emergency Instruction*

B&C also contends the district court erred in giving a "sudden emergency" instruction. While the substance of a jury instruction in a diversity case is a matter of state law, whether or not an instruction is given is governed by federal law. Blanke v. Alexander, 152 F.3d 1224, 1232 (10th Cir. 1998). Although we review the district court's giving of a particular instruction for abuse of discretion, the ultimate question of whether the jury was properly instructed is a question of law we review de novo. Id. The district court used Colorado's boilerplate sudden emergency instruction which states: "A person or corporation who, through no fault of his, her, or its own, is placed in a sudden emergency, is not chargeable with negligence if that person or corporation exercises the degree of care which a reasonably careful person or corporation would have exercised under the same or similar circumstances." App. I at 155 (Instruction No. 17). B&C argues there were insufficient facts to support the giving of the instruction because there was no evidence of an emergency. Additionally, it argues, to the extent there was an emergency, Elliot created the emergency when he climbed onto the bridge.

Under Colorado law, the existence of an "emergency," is a question of fact for the jury to assess in deciding whether the sudden emergency doctrine should apply. See Carlson v. Ferris, 58 P.3d 1055, 1059 (Colo. Ct. App. 2002) (noting if there is factual

14

dispute as to fault of plaintiff claiming sudden emergency, dispute should be submitted to jury); Colwell v. Mentzer Inv., Inc., 973 P.2d 631 (Colo. Ct. App. 1998) (same). A court must include the instruction if there is any reasonable evidence tending to support a finding of a sudden emergency. See Carter v. Unit Rig & Equip. Co., 908 F.2d 1483, 1487-88 (10th Cir. 1990).

We conclude it was not an abuse of discretion to include this instruction. Based on the evidence presented, a jury reasonably could find that an emergency was created when, through no fault of Elliot, it appeared the bridge was about to slide into the river. Additionally, a jury could find that Elliot acted reasonably in responding to the emergency by trying to prevent the bridge from falling. Conversely, based on the same evidence, a jury could find (as it appears this jury did in light of its partial attribution of negligence to Elliot) that Elliot was either not placed in a sudden emergency or did not act reasonably. The instruction was a proper statement of Colorado law and provided the jury guidance in resolving a factual issue arising from the evidence presented.

*Duty of Care*

B&C also argues Elliot's actions were not reasonably foreseeable and the trial court erred in determining B&C owed Elliot a duty of care. As B&C is appealing the denial of its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), we review this issue de novo and apply the same standards as the district court. Guides, Ltd. v. Yarmouth Group Prop. Mgmt, Inc., 295 F.3d 1065, 1073 (10th Cir.

2002). Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position. See Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 812 (10th Cir. 2000). The existence and scope of any duty, including whether the injury was foreseeable, are questions of law. Metropolitan Gas Repair Serv., Inc. v. Kulik, 621 P.2d 313, 317 (Colo. 1980). In determining whether Elliot's injuries were foreseeable, we view the evidence in a light most favorable to Elliot, the non-moving party. Tyler, 232 F.3d at 812.

Elliot contends that B&C has waived its argument that Elliot's injuries were not foreseeable. Specifically, he argues B&C stipulated in its final pretrial order that defendants owed a duty to exercise reasonable care and, at the close of evidence, B&C failed to file a Rule 50(a) motion for judgment as a matter of law, but instead raised the claim through a post-trial Rule 50(b) motion for judgment as a matter of law.

Although B&C stipulated that it owed a duty to exercise reasonable care, we do not read this stipulation as encompassing the question of foreseeability because B&C also included in its list of claims and defenses in the same final pretrial order the assertion that Elliot's "actions were not foreseeable." App. I at 70. Further, since Elliott failed to oppose B&C's Rule 50(b) motion on the ground that B&C did not preserve its foreseeability argument in a Rule 50(a) motion, he cannot now challenge B&C's Rule 50(b) motion on that ground. "[W]here a party did not object to a movant's Rule 50(b)

16

motion specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the party's right to object on that basis is itself waived." Williams v. Runyon, 130 F.3d 568, 572 (3d Cir. 1997).[4]

In addressing the merits of B&C's foreseeability argument, we look to Colorado law. Under Colorado law, in order for a defendant to owe a party a duty of care, that party's actions must be foreseeable. Greenberg v. Perkins, 845 P.2d 530, 536-37 (Colo. 1993). B&C contends it did not owe Elliot a duty of care because Elliot's "conduct [wa]s so egregious . . . that [his] actions must be considered as falling outside the pale of what the law will consider foreseeable." Aplt. Br. at 38. In other words, because Elliot chose to "remove[] himself from a secure and safe position" and placed himself in "one that he understood was potentially unsafe," B&C argues it should not be held liable for Elliot's injuries because no reasonable person would have anticipated his actions. Id.

B&C's argument relies on the premise that foreseeability is determined by whether the defendant reasonably could have anticipated the actual cause of the plaintiff's injury. Under Colorado law, however, "[t]o establish that an incident is foreseeable, it is not necessary that [a tortfeasor] be able to ascertain precisely when or how an incident will

---

[4] See also Thompson & Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429, 435 (5th Cir. 1997); Whelan v. Abell, 48 F.3d 1247, 1251-53 (D.C. Cir. 1995); Gibeau v. Nellis, 18 F.3d 107, 109 (2d Cir. 1994); Collins v. Illinois, 830 F.2d 692, 698 (7th Cir. 1987); Beauford v. Sisters of Mercy-Province of Detroit, Inc., 816 F.2d 1104, 1108 n.3 (6th Cir. 1987); Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 293-95 (8th Cir. 1982).

17

occur." HealthONE v. Rodriguez, 50 P.3d 879, 889 (Colo. 2002). Instead, the test is whether the defendant reasonably should have anticipated *any* injury.

> [F]oreseeability includes whatever is likely enough in the setting in modern life that a reasonably thoughtful person would take account of it in guiding practical conduct. In other words, in order for an injury to be a foreseeable consequence of a negligent act, it is not necessary that the tortfeasor be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur, but only that some injury will likely result in some manner as a consequence of his negligent acts.

Id. (internal quotation omitted).

In light of this rule, the question here is whether B&C reasonably should have anticipated that its attempt to remove the nylon strap holding the bridge would cause Elliot's injury. Elliot was the person responsible for overseeing the assembly and launch of the bridge. Therefore, it would not be unreasonable to anticipate that he would be standing nearby and would do everything possible to assure the launch was a success, including getting on the bridge in an attempt to stop the launch when he saw Boyd attempt to remove the nylon strap. Viewing this series of events in the light most favorable to Elliot, we conclude it was foreseeable that B&C's actions might injure Elliot. Therefore, we conclude the district court correctly held that B&C owed Elliot a duty of care.

We REVERSE the verdict against Turner Construction, concluding it was Elliot's statutory employer and therefore immune from suit. We AFFIRM the verdict against B&C.

18