**DEL STATE BANK, an Oklahoma Banking Corporation, Appellant,**

v.

**Randel E. SALMON, Appellee.**

**No. 46964.**

Supreme Court of Oklahoma.

April 6, 1976.

Garrett, Pool, Amis & Coldiron, by Robert W. Amis, Del City, for appellant.

John B. Hayes, Watts, Looney, Nichols, Johnson & Hayes, Oklahoma City, for appellee.

LAVENDER, Justice:

Del State Bank (bank), appellant, sued on a promissory note in the principal amount of $18,000, evidencing a loan to Randel E. Salmon (Salmon) for purchase of 10,000 shares of Amerand, Inc. (Amerand). The shares were pledged for the indebtedness to the bank.

Amerand was a customer of and had close business relations with the bank.

The bank's president, Suttle, and its board chairman, Epperly, were directors of Amerand. Salmon was Amerand's president, principal operating officer, and a director.

To raise badly needed operating capital, contended by Salmon to have been caused by the bank, members of Amerand's board agreed individually to purchase additional stock. This new stock was to come from the exercising of stock warrants held by another corporation, Ventron. Salmon, as did some of the others, financed his stock purchase through the bank. He gave a promissory note secured by the stock. It was this note the bank sued on. Along with the other board members, Suttle and Epperly made purchase of this stock. Subsequent to the raising of this new operating capital, Suttle resigned from Amerand's board.

Amerand continued to have operating capital problems. Board meetings were held January 8 and 15, 1970. Suttle was present by invitation and representing the bank as a major creditor. Minutes and passed resolutions of these meetings were introduced into evidence. There is conflicting testimony as to actual occurrences at the meetings and the roles played by various individuals, including Suttle. At the January 15th meeting, Salmon offered to resign under certain conditions. This included settlement of future compensation provided in his employment contract. The board terminated Salmon and refused compensation.

Thereafter another entity, United Investors (United), became the principal stockowner and manager of Amerand. Suttle, Epperly, and other board members of Amerand transferred their stock in exchange for stock in United. There was conflict in evidence whether Salmon refused to transfer his stock on the same basis or whether he was not given that same opportunity. After United was operating Amerand, Salmon sought to transfer his stock assigned to him through Ventron. This was refused.

Salmon in his counter-claim, alleged wrongful interference by the bank through acts of Suttle with his employment contract and with transfer of his stock through acts of Suttle or Epperly. Agency of Suttle and Epperly as to their acts was agreed to by the bank. Salmon sought recovery of $48,000 on his counter-claim. He pled $30,000 damage for interference with his employment and $18,000 for interference with transfer of his stock. The bank raised the defense of statute of limitation as to the employment interference in its reply.

Without objection of either party, the jury was given a form of verdict providing for total damages with no provision for determination of the breakdown of any recovery as between the employment interference and the stock transfer interference. The jury returned an instructed verdict for the bank of $18,000 plus the contracted rate of interest on the promissory note. It returned a general verdict for Salmon on the counter-claim of $40,000.

On appeal, the bank argues excessive damages given by the jury under influence of passion or prejudice. This argument appears based on the insufficiency of the evidence as to the two separate types of interference by the bank; (1) as to employment with a maximum recovery of $30,000 as limited by the allegation of the amount of damage, and (2) as to transfer of Salmon's stock with a minimum recovery of $10,000 damage under the jury's general verdict of $40,000. The bank, in its brief, takes the position the only evidence as to the value of the stock was $15,000 and the minimum recovery allowed by the jury as to this item of damage would be that amount, leaving $25,000 for damages as to the other interference.

■ Trial court's instructions No. 6 and 7 [1] to the jury dealt with the employment interference. Both parties acknowledged agreement with the instructions in their briefs. The record shows no exception to them as given. Instruction No. 6 gave Salmon the right to be free of interference in pursuing his employment. If one, without a privilege, intentionally interferes; if unlawful means are used; or if done without justifiable cause; then he becomes liable to the employee for proximately caused harm. Intentional interference may be malice in the law without personal hatred, ill will, or spite.

1. Trial court's instructions No. 6 and 7 read:

"6. You are further instructed that one has a right to be secure in his contracts and to pursue his business or employment free from the interference of others, except where such others act pursuant to a superior or equal right.

"In this connection, one who, without a privilege to do so, intentionally attempts to interfere or induce, or otherwise purposely causes an employer to discharge an employee, if unlawful means are used or if done without justifiable cause, is liable to the employee for the harm proximately caused thereby. And this is so regardless of whether the employee may have a right of action against his employer upon the contract of employment.

"In this further connection you are instructed that the terms 'intentional' or 'malicious,' as used under these circumstances does not necessarily include the popular sense of personal hatred, ill will, or spite, but an intentional interference is malicious in law, even if it is the result of good motives and express malice is lacking. 'Malice' in its technical sense does not imply a culpable intent, but is the intentional doing of a harmful act without justification or privilege."

"7. One who purposely causes an employer to discharge an employee in order to influence the employer's policies in the conduct of the business is privileged if:

(a) The actor has an economic interest in the matter with reference to which he wishes to influence the policy of the employer; and,

(b) The means employed are not improper. However, the immunity is not retained if unfair methods are used in interfering with the employment agreement.

"And it is not unlawful to interfere, by fair means and lawful argument or persuasion, with the contractual relations of another, where accompanied by the honest intent and purpose of thoroughly bettering one's own business, trade, or employment, and not for the primary object of wrongfully harming another."

■ Instruction No. 7 allowed a privilege if that person has an economic interest and improper or unfair means are not used. One may lawfully interfere with the contractual relations of another if by fair means, if accompanied by honest intent, and if to better one's own business and not to principally harm another.

There is evidence whereby the jury could find Suttle did intentionally interfere with Salmon's employment. The bank admits this in its briefs. The bank had an economic interest as a substantial creditor of Amerand. Nothing indicates Suttle acted other than for the intended purpose of bettering the bank. Although Suttle's acts were detrimental to Salmon's, it was not his primary object to wrongfully harm Salmon. The bank was entitled to the privilege allowed under Instruction No. 7 unless Suttle's acts were unfair means or methods.

The bank argues there was no evidence of Suttle's acts being unfair. Salmon contends the entire approach of the bank to the Amerand problem was improper. Amerand's merger with Randel Manufacturing Company and the assumption of that company's debt to the bank, the promise and subsequent refusal of Suttle and Epperly to supply new capital for the merger and resulting shortage of operating capital, the exchange of Amerand's stock for United's and operating takeover of Amerand by United, not compensating Salmon under his employment contract and probably causing default on his bank note, threat of no more bank loans to Amerand unless Salmon was removed; all prove a course of action improper and unfair.

■ We find no evidence of an overall course of action by the bank, beginning with the merger in 1969, unfair to Salmon as to destroy the bank's privilege to interfere with Salmon's employment. Evidence was sufficient to sustain a finding the bank's acts were designed to benefit the bank. Those acts could be found to be strong, aggressive, and intentionally made

to protect the bank. Its economic power was used to influence Amerand's board to terminate Salmon's employment. The bank's primary object was to better its financial position as to the Amerand loans. The primary object was not to wrongfully harm Salmon, though the acts were to his detriment. One need not agree with the bank's actions, but it exercised a privilege to lawfully interfere. Salmon's brief describes the bank's acts as deplorable at best. We could agree but we cannot find evidence as to their being unfair and improper as to Salmon. The evidence does not establish the bank's means and methods were improper and unfair to Salmon so as to destroy that privilege.

The evidence does not sustain a finding of unfair action by the bank through Suttle to uphold recovery of damages by Salmon from the bank as to interference with his employment under agreed instructions Nos. 6 and 7.

In *National Life & Accident Ins. Co. v. Wallace,* 162 Okl. 174, 21 P.2d 492 (1933) this court reversed and did not allow to stand a judgment based on interference with another's business. There an insurance company, through its agents, advised its policy holders, some of whom were patients of a certain doctor, that certificates of that particular doctor for payment of claims were unsatisfactory to it. The opinion adopts as the rule governing the parties that stated in *Knapp v. Penfield,* 143 Misc. 132, 256 N.Y.S. 41:

" * * * It would seem under the circumstances that such defendants were acting within their own rights, and did not wrongfully cause an injury to plaintiff. Procuring the breach of a contract in the exercise of an equal or superior right is acting with just cause or excuse, and is justification for what would otherwise be an actionable wrong. A party to a contract ordinarily has the right to perform and to have same performed without interference by a non-party or stranger. Such interference, unless priv-

ileged, justified or excusable, is an actionable wrong arising out of the invasion of the party's right to freedom from interference with the contract and performance thereunder. Persons acting for the protection of contract rights of their own which are of an equal or superior interest to another's contractual rights may invade the latter with impunity."

The tenor of that rule is found in much of the language used in Court's Instruction No. 6. This portion of the *National Life* opinion was exclusive of and in addition to the insurance company's right under its policies to require the physician to be satisfactory to it. The *National Life* opinion also cites and quotes from *Schonwald v. Ragains*, 32 Okl. 223, 122 P. 203 (1912):

" * * * It is not unlawful for one, by fair means and lawful argument or persuasion, to interfere with the contractual relations of another, and without doubt one person has the legal right to persuade another * * * to quit trading with another, provided always such persuasion and argument is fair, * * * and is made with the honest intent and purpose of fairly bettering one's own business, trade, or employment, and not for the primary object of wrongfully destroying honest competition, or wrongfully injuring one's competitor."

The latter part of Court's Instruction No. 7 follows this language.

 We do not find sufficient evidence to sustain a finding the bank, through acts of Epperly or Suttle, interfered with Salmon's transfer of his stock. Salmon established he was not allowed to transfer. He made at least two attempts to transfer; through a broker, Securities Corporation of America, and through a Mrs. White at United, after it was operating Amerand. Amerand's board, in 1969 and on its then president's (Salmon's) recommendation, passed a resolution refusing to transfer any stock issued under Ventron's warrants. This followed the advice of Amerand's counsel based on a position taken by the Oklahoma Security Commission. Salmon, at this later date, sought to convince Amerand's management, then United, into making the transfer through other counsel's opinion and urging that such a transfer was proper. Epperly, Suttle, and others, holding similar stock, did transfer and exchange their stock for United's. There was no evidence Amerand's refusal, acting through United and though possibly not justified, was caused by acts of the bank through Epperly or Suttle. There was no evidence the bank, through the acts of Epperly or Suttle, interfered with the requested transfer by Salmon. We hold that part of the recovery on the counter-claim based on interference with transfer of the stock is not sustained.

The issues determined under this opinion are decisive of this case. For that reason no consideration has been given to any statute of limitations problem, the effect of recovery under a counter-claim, or whether the amount of the jury verdict was proper.

Reversed as to judgment on the counter-claim.

WILLIAMS, C. J., and DAVISON, IRWIN, BERRY, and SIMMS, JJ., concur.

HODGES, V. C. J., and BARNES and DOOLIN, JJ., dissent.