**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AUSTRALIAN GOLD, INC.;
ADVANCED TECHNOLOGY
SYSTEMS, INC.; ETS, INC.,

     Plaintiffs - Appellees,

v.

BRENDA HATFIELD; MARK
HATFIELD; MATTHEW HATFIELD;
PALM HARBOR TANNING &
DISTRIBUTING, INC., doing
business as Miti-Fine Tan & Tone;
INTERNET MARKETING GUYS;
BUBBA'S TANNING SALON;
INTERNET MARKETING GUYS
TANNING SALON; JOANNA
HATFIELD; TAN TIME, INC.;
QUALITY TANNING &
DISTRIBUTING L.L.C., doing
business as United Domain
Management,

     Defendants - Appellants.

No. 03-6218

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 02-CV-143-C)**

---

Jack S. Dawson, Miller Dollarhide, Oklahoma City, Oklahoma (James A.
Scimeca, Mark S. Edmondson, Miller Dollarhide, Oklahoma City, Oklahoma, with
him on the briefs), for Defendants-Appellants.

Michael A. Wukmer, Ice Miller, Indianapolis, Indiana (Scott D. Matthews, Ice Miller, Indianapolis, Indiana; D. Kent Meyers, Crowe & Dunlevy, P.C., Oklahoma City, Oklahoma, with him on the brief), for Plaintiffs-Appellees.

---

Before **EBEL**, Circuit Judge, **TYMKOVICH**, Circuit Judge, and **BROWNING**, District Judge.[*]

---

**EBEL**, Circuit Judge.

---

This case stems from Defendants' unauthorized resale over the internet of indoor tanning lotions manufactured and distributed by Plaintiffs. Plaintiffs sued Defendants for trademark infringement, false advertising, and tortious interference with the contracts between Plaintiffs and their distributors. Defendants filed this appeal after a jury awarded Plaintiffs over $5 million in compensatory and punitive damages.

In this appeal, Defendants assert that the district court erred in denying Defendants' motion for judgment as a matter of law on Plaintiffs' claims. Defendants also challenge the district court's jurisdiction to consider Plaintiffs' state-law tortious interference claim, the entry of an injunction barring Defendants from selling Plaintiffs' products over the internet or using Plaintiffs'

---

[*] Honorable James O. Browning, District Court Judge, United States District Court for the District of New Mexico, sitting by designation.

- 2 -

trademarks in connection with Defendants' Web sites, and the imposition of sanctions on Defendants for discovery abuses.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court.

## BACKGROUND

### I.     Plaintiffs

Plaintiffs are three related businesses that manufacture and distribute indoor tanning lotions. Plaintiff Australian Gold, Inc., manufactures Australian Gold and Caribbean Gold tanning lotions and owns all trademarks related to those two brands. Plaintiff Advanced Technology Systems, Inc., manufactures Swedish Beauty tanning lotions and owns all trademarks related to that brand. Plaintiff ETS, Inc., is the exclusive distributor of Australian Gold, Caribbean Gold, and Swedish Beauty indoor tanning lotions and related products ("Products").[1]

Approximately fifty to sixty percent of the 25,000 tanning salons in the United States carry Products. ETS does not distribute Products directly to these tanning salons, but rather contracts with independent distributors who in turn sell Products to salons. Indeed, in order to contract with ETS, these independent

---

[1]Australian Gold, Inc., distributes some of its outdoor products—what might commonly be referred to as sunscreen or suntan lotion—itself, rather than through ETS. In certain places, these outdoor products can be purchased off the shelf, without any consultation. However, it is indoor tanning products, not outdoor products, that are at issue in this lawsuit.

distributors must agree to market, distribute, or sell Products only to "a tanning salon or hair and beauty care salon" that "offers indoor tanning and instruction of the use of Products as an on-premises service." Since 2001, these agreements have generally prohibited distributors from selling Products over the internet or selling Products to anyone else who will sell them to the general public over the internet.[2] Plaintiffs enforce the integrity of these agreements by attempting to stem the flow of Products to businesses other than tanning salons, and have spent over $1 million on such efforts.

All the distributors with whom ETS contracts also must participate in training programs, make their sales associates available to Plaintiffs twice each year for training, and hold two seminars to train salons on the proper use of Products. In 2003, Plaintiffs spent $1.5 million on training, using some 600 presentations to reach over 20,000 people employed by distributors and salons. Plaintiffs emphasize training in part because a consumer's use of the wrong product could cause an adverse reaction, which could harm Plaintiffs' prospects for follow-on sales. Training also makes distributors and salon owners aware of

---

[2]Because Defendants' alleged interference with ETS's contracts continued after 2001, we need not examine the pre-2001 agreements that ETS and Advanced Technology Systems made with distributors in order to address the tortious interference issue at stake in this appeal.

"up-selling" possibilities: Customers who purchase indoor tanning lotion may also purchase body spray, moisturizers, and facial products.

## II.    Defendants

Defendants resell Products over the internet without Plaintiffs' authorization. Husband and wife Mark and Brenda Hatfield; their son, Matthew; and Matthew's wife, Joanna, all play a role in their business. The other named Defendants—Palm Harbor Tanning and Distributing, Inc.; Internet Marketing Guys, Inc.; Bubba's Tanning Salon; Internet Marketing Guys Tanning Salon; Tan Time, Inc.; and Quality Tanning & Distributing LLC d/b/a/ United Domain Management—are all businesses created by the Hatfields through which the Hatfields have resold Products over the internet.

Because the Hatfields were aware that Plaintiffs objected to the sale of Products on the internet, the Hatfields concealed their activities. For example, by switching the original name of the business from "The Internet Marketing Guys" to "Palm Harbor Tanning and Distributing" to make it appear that it was operating a tanning salon, the Hatfields could purchase Products from an ETS-authorized distributor without being detected by Plaintiffs. Moreover, the Hatfields used fictitious names to register the multiple Web sites that they used to sell Products. The Hatfields also used other fictitious business names—including Yukon Tan, Tulsa Tanning Supply, Oklahoma Tanning, Internet Marketing Guys Tanning

Salon, and Bubba's Tanning Salon—to place orders from ETS-authorized distributors who had been warned not to sell to the Hatfields. Finally, in an effort to appear to be legitimate purchasers of Products, the Hatfields stated to at least one supplier that they operated a network of ten tanning salons, when in fact they did not.

Defendants initially obtained Products from ETS-authorized distributors who violated their distributor agreements with ETS by supplying Products to Defendants. One such ETS-authorized supplier was AETS. During the seven-month tanning season, Defendants placed orders with AETS for $10,000-$18,000 worth of tanning supplies—of which forty to fifty percent were Products—three times per week. During the five-month offseason, Mark Hatfield on average placed orders for $5,000-$8,000 worth of Products once or twice per week.

In 2003, ETS discovered this activity and terminated its contract with AETS. Defendants then turned to an anonymous supplier of Products who sold Products to the Hatfields out of a van for cash only. Each of the Hatfields' cash transactions with this supplier was worth more than $24,000; one exceeded $64,000.

The Hatfields used up to seven Web sites to sell Products to the general public. The Web sites displayed pictures and descriptions of Products and used Plaintiffs' trademarks. The Hatfields also used Plaintiffs' trademarks in the

metatags of their Web sites.[3]  Further, Defendants paid a company called Overture.com for an "Overture Premium Listing" for "Australian Gold" and "Swedish Beauty," guaranteeing that one of Defendants' Web sites would be among the first three listed if either of Plaintiffs' trademarks was used in an internet search query.

Once customers arrived at the Hatfields' Web sites, they could buy lotions from a variety of manufacturers, not just Plaintiffs.  Moreover, beginning in October or November 2002 and ending in January 2003, Defendants removed Products from their Web sites altogether.  However, during this time, Defendants continued to use the trademarks "Australian Gold" and "Swedish Beauty" on the metatags for their Web sites to attract customers to the Web sites, and to pay Overture.com for a premium placement if either trademark was used in a search query.

## III.   Plaintiffs' Lawsuits against Defendants

Plaintiffs uncovered Defendants' actions in January 2001.  After notifying Defendants that they objected to the sale of Products over the internet, Plaintiffs

---

[3]A metatag is a part of a Web site that is not seen by the public, but is read by search engine web browsers and later used by the browsers to classify the Web site. Metatags are used to increase the probability that a Web site will be seen by a customer who has typed a particular search query into his or her search engine. See Deborah F. Buckman, Annotation, Initial Interest Confusion Doctrine under Lanham Trademark Act, 183 A.L.R. Fed. 553.

filed suit in an Indiana state court against The Internet Marketing Guys. The Internet Marketing Guys failed to answer the complaint, and the court entered a default judgment against the company.[4]

Plaintiffs brought this suit in Oklahoma state court in December 2001, and Defendants removed the case to federal court shortly thereafter. In their amended federal-court complaint, Australian Gold and Advanced Technology Systems alleged that Defendants infringed upon their respective trademarks. Australian Gold and Advanced Technology Systems also asserted claims against Defendants for false advertising and for unfair competition under state law. ETS alleged that Defendants interfered with ETS's agreements with various distributors and that Defendants engaged in a civil conspiracy to breach those agreements.

The court granted summary judgment in favor of Brenda and Joanna Hatfield on Plaintiffs' claims of trademark infringement and false advertising. Plaintiffs proceeded to trial on their other claims. At trial, Defendants moved for judgment as a matter of law on all the claims after Plaintiffs rested and at the close of all evidence. The district court granted Defendants' motion as to

---

[4]Neither party argues on appeal that res judicata or collateral estoppel applies in this suit, and we therefore do not address the issue. See Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.), 385 F.3d 1279, 1286 (10th Cir. 2004) ("[R]es judicata is not a jurisdictional bar; it is an affirmative defense . . . .") (quotation omitted), cert denied, 126 S. Ct. 337 (2005).

Plaintiffs' claims of unfair competition. However, the district court allowed the remaining claims to go to the jury.

The jury returned a verdict in Plaintiffs' favor. Australian Gold and Advanced Technology Systems were awarded damages of $325,000 and $125,000, respectively, on their trademark infringement claims. Australian Gold and Advanced Technology Systems were also awarded damages of $35,000 and $15,000, respectively, on their false advertising claims. ETS was awarded damages of $500,000 on its interference claims. In addition, the jury found that each Defendant engaged in a conspiracy to interfere with ETS's contracts with distributors. The jury also awarded punitive damages against all Defendants in connection with the tortious interference and conspiracy claims: $1 million against both Mark and Matthew Hatfield, $320,000 against Brenda Hatfield, $350,000 against Joanna Hatfield; $780,000 against Palm Harbor; and $780,000 against Quality Tanning. Finally, the district court enjoined Defendants from selling Products over the internet, displaying Plaintiffs' trademarks on the internet, or using Plaintiffs' trademarks in the metatags or html code for their Web sites.

This appeal from Defendants followed.

## DISCUSSION

### I.     Subject Matter Jurisdiction

We review de novo whether subject matter jurisdiction is proper in this case. Kinross v. Utah Railway Co., 362 F.3d 658, 660 (10th Cir. 2004). Because removal of the case from state court to federal court was permissible under 28 U.S.C. §§ 1441 and 1332, we hold that proper subject matter jurisdiction exists.[5]

Title 28, United States Code § 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction . . . may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." In this case, 28 U.S.C. § 1332 provided the district court with the original jurisdiction necessary to support removal under § 1441(a). The parties to this lawsuit are diverse: Plaintiffs are Indiana corporations with their principal places of business in Indiana, and the named Defendants are Oklahoma citizens, and this case satisfies § 1332's amount-in-controversy requirement.

Defendants argue that Plaintiffs' naming of ten alleged co-conspirator "John Does" in the complaint barred the removal of ETS's state-law claim for tortious interference to federal court because the unknown citizenship of the "John Does" destroyed complete diversity. This contention is without merit.

---

[5]Because we resolve this matter based on 28 U.S.C. §§ 1441 and 1332, we need not consider Plaintiffs' contention that 28 U.S.C. § 1367 would have allowed ETS to bring its state-law tortious interference claim in federal court originally, and thus render removal appropriate. We also do not address Plaintiffs' argument that removal was permissible under § 1441(c).

Title 28, United States Code § 1441(a) provides that "[f]or purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded." While we have not construed this portion of § 1441(a), other courts have held that "John Does" are disregarded for purposes of removal on the basis of diversity of citizenship. See Howell ex rel. Goerdt v. Tribune Entm't Co., 106 F.3d 215, 218 (7th Cir. 1997) ("[N]aming a John Doe defendant will not defeat the named defendants' right to remove a diversity case if their citizenship is diverse from that of the plaintiffs."); Alexander v. Electronic Data Sys. Corp., 13 F.3d 940, 948 (6th Cir. 1994) ("It is clear that 'Jane Doe' is a fictitious name; no such real person was ever named, and plaintiff never identified the alleged person . . . . Section 1441(a) compels that this 'named' defendant be disregarded for purposes of diversity jurisdiction."). We join these other circuits in holding, consistent with the text of 28 U.S.C. § 1441(a), that the citizenship of "John Doe" defendants should be disregarded when considering the propriety of removal under 28 U.S.C. §§ 1441(a) and 1332.

Because 28 U.S.C. §§ 1441(a) and 1332 together permitted Defendants to remove this suit to the district court, the district court did not err in exercising jurisdiction over this case.

## II. Tortious Interference with Contract

We review a district court's denial of a party's motion for judgment as a matter of law de novo, applying the same standard as the district court and construing the evidence in the light most favorable to the nonmoving party. See O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing parties' position." Elliot v. Turner Constr. Co., 381 F.3d 995, 1005 (10th Cir. 2004).

Defendants argue that the district court erred in denying their motion for judgment as a matter of law on ETS's claim for tortious interference with contract because (1) the contracts with which Defendants allegedly interfered were illegal, (2) Defendants acted neither maliciously nor wrongfully, and (3) Plaintiffs did not present evidence of damages for tortious interference. These arguments are without merit.

## A.    Legality of the Distributorship Agreements

"The right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid enforceable contract." Ellison v. An-Son Corp., 751 P.2d 1102, 1106 (Okla. Ct. App. 1987) (quotation omitted). The agreements between ETS and its distributors provide that "ETS may also terminate this Agreement . . . after . . . Distributor's and/or Subdistributor's

failure to comply with any suggested price for Products that is announced from time to time by ETS." Defendants argue that this provision in ETS's agreements with its distributors makes those contracts per se invalid under the Sherman Act as vertical price-fixing agreements, and thus that the agreements cannot form the basis of a valid tortious interference claim.

Under the Sherman Act, 15 U.S.C. § 1,

[i]ndependent action is not proscribed. A manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. . . . [T]he manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.

Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) (citations omitted); see also Systemcare, Inc. v. Wang Labs. Corp., 117 F.3d 1137, 1143-44 (10th Cir. 1997) (reh'g en banc).

In this case, ETS's distributor agreements are the sort of "independent action[s]" that Monsanto condones. The agreements specifically state that "ETS does not request and will not accept Distributor's agreement to comply with any such suggested price, and nothing herein shall be deemed to constitute Distributor's agreement with ETS as to the resale price for Products that Distributor may charge." Thus, the agreements are ETS's unilateral statements of

the terms on which it will deal with distributors, and as such are permissible under Monsanto.[6]

Therefore, the alleged illegality of ETS's agreements with its distributors does not establish that the district court erred in denying Defendants' motion for judgment as a matter of law on ETS's tortious interference claim. This is because ETS's agreements are in fact legal.

## B.     Maliciousness and Wrongfulness

To recover on a tortious interference claim under Oklahoma law, a plaintiff must establish that "the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable." Morrow Dev. Corp. v. Am. Bank & Trust Co., 875 P.2d 411, 416 (Okla. 1994) (emphasis omitted). It is lawful to "interfere with the contractual relations of another if [this is done] by fair means, if [it is] accompanied by honest intent, and if [it is done] to better one's own business and not to principally harm another." Del State Bank v. Salmon, 548 P.2d 1024, 1027 (Okla. 1976).

Defendants argue that they were entitled to judgment as a matter of law on ETS's tortious interference claim because Plaintiffs did not prove that Defendants acted with malice. However, there was sufficient evidence that Defendants'

---

[6]Defendants' reliance on Dr. Miles Medical Co. v. John D. Parke & Sons Co., 220 U.S. 373 (1911), is misplaced, for that case involved concerted action by a supplier and distributors to set prices. See Monsanto, 465 U.S. at 761.

conduct might have been malicious and wrongful to justify submitting this issue to the jury. In an effort to undermine ETS's distribution channels, Defendants concealed their activities from Plaintiffs; used fictitious names to register their activities; changed the name of their business to make it appear to suppliers to be a legitimate tanning salon; ordered products using a fake business name; and dishonestly stated to suppliers that they had a network of ten salons. Defendants boasted that they had "the balls and $ to stand up to ETS," and stated that their "suppliers [were] protected" from ETS. Defendants knew that their actions were not allowed under ETS's agreements with its distributors, yet Defendants undertook such actions anyway.

A simple recitation of the sum of Defendants' actions reveals that they were not "fair means . . . accompanied by honest intent." Id. In any event, all the evidence does not clearly indicate that Defendants' behavior was not malicious, as would be required to support Defendants' motion for judgment as a matter of law.

Defendants rely on two cases that rejected claims similar to this one for the proposition that Defendants' resale of Products did not demonstrate malice. However, those cases are distinguishable from the case at bar. In Sebastian International, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073 (9th Cir. 1995) (per curiam), "[n]othing in the record suggest[ed] that [the defendant] did anything more than stock and resell genuine . . . products *lawfully acquired on the open*

*market.*" Id. at 1076 (emphasis added). Similarly, in Matrix Essentials, Inc. v. Cosmetic Gallery, Inc., 870 F. Supp. 1237 (D. N.J. 1994), aff'd, 85 F.3d 612 (3d Cir. 1996), the "defendants did not commit tortious acts, such as fraud." Id. at 1248. By contrast, in this case Defendants purchased Products using deceptive means, not the open market, relying on tortious acts like using a fake name and dishonestly stating that they operated a network of ten salons to purchase Products.

Thus, the district court did not err in denying Defendants' motion for judgment as a matter of law on ETS's tortious interference claim. The evidence at trial was such that a reasonable jury could find that Defendants acted with malice.

## C. Damages for Tortious Interference

In order to recover on a tortious interference claim under Oklahoma law, a plaintiff must show "[t]hat damage was proximately sustained as a result of the complained-of interference." Mac Adjustment, Inc. v. Property Loss Research Bureau, 595 P.2d 427, 428 (Okla. 1979). Such damages might include "the pecuniary loss resulting to the [plaintiff] from the failure of the third person to perform the contract," "consequential losses for which the interference is a legal cause," and "emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (Second)

of Torts, §§ 766, 774A (1979). Because in this case Defendants have not challenged the amount of the verdict against them, if a jury reasonably could have inferred based on the evidence presented at trial that ETS suffered *any* measurable damages, then the district court did not err in submitting ETS's tortious interference claim to the jury. See Elliot, 381 F.3d at 1005.

Plaintiffs did present some evidence at trial from which the jury could have inferred the damages that ETS suffered. As noted above, Defendants obtained Products from AETS, one of ETS's distributors, from at least 2001 through 2003. Partly as a result of AETS's diversion of Products to Defendants, ETS terminated its contract with AETS. Thus, partly as a result of Defendants' interference, ETS lost the value of the legitimate sales it had been making to AETS. One of ETS's contracts with AETS provided that AETS was required to purchase $200,000 of Products. Thus, the jury could have inferred based on this contract what the value of AETS's legitimate sales may have been.

Moreover, the evidence supported the claim that because Defendants made Products widely available over the internet, the value of each independent distributorship may have decreased. Distributors no longer could exercise as much control over the flow and price of Products as they otherwise might have. Because the value of each distributorship may have decreased, ETS may not have been able to negotiate agreements with individual distributors on terms as

favorable as it once might have. As noted above, Plaintiffs introduced evidence of AETS's minimum purchase requirements at trial. Thus, there was some evidence from which the jury could infer ETS's damages.

Finally, Plaintiffs offered evidence of approximately $1 million worth of expenses that ETS incurred protecting its distribution channels by combating the distribution of Products over the internet. Plaintiffs also offered testimony that ETS undertook these efforts in part because (1) sales over the internet undercut chances for add-on sales and upgrades, which occurred more frequently with face-to-face service in salons; (2) sales over the internet undercut ETS's commitment to salons and distributors that Products would only be made available to consumers through salons, threatening ETS's continued relationships with those entities; and (3) consumers who purchased Products over the internet might buy a lotion that did not work well for them, making follow-on sales less likely than they would be if Products were sold only in salons. Thus, ETS's expenditures combating product diversion amount to mitigation damages—that is, damages incurred as a result of attempting to minimize other types of damages.

For these reasons, the evidence on damages, when viewed in the light most favorable to Plaintiffs, is not so one-sided that it supports Defendants' motion for judgment as a matter of law. None of Defendants' three contentions indicate that

the district court erred in denying Defendants' motion for judgment as a matter of law on ETS's tortious interference claim.

## III. Lanham Act Claims

Defendants argue that the district court erred in denying Defendants' motion for judgment as a matter of law on Plaintiffs' Lanham Act claims because Plaintiffs did not present evidence of a likelihood of consumer confusion, Defendants' activities were shielded by the first sale doctrine, and Plaintiffs did not present evidence of damages sufficient to support their Lanham Act claims. Defendants' arguments are without merit.

### A.      Likelihood of Confusion

"The unauthorized use of 'any reproduction, counterfeit, copy, or colorable imitation' of a registered trademark in a way that 'is likely to cause confusion' in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act." Universal Money Ctrs., Inc. v. AT&T Co., 22 F.3d 1527, 1529 (10th Cir. 1994); see 15 U.S.C. § 1114(1)(a)-(b). The party alleging infringement has the burden of proving likelihood of confusion. See Universal Money Ctrs., 22 F.3d at 1530. Ordinarily, to prevail on a trademark infringement claim, a plaintiff must demonstrate that a defendant's use of the trademark is likely to cause consumers to believe either that the plaintiff is the source of the defendant's products or services (direct confusion), or alternatively, that the defendant is the source of the plaintiff's products or services (reverse confusion). See id.

In this case, we recognize another variant of potential confusion: "initial interest confusion." Initial interest confusion results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark. See Buckman, 183 A.L.R. Fed. 553. Even though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor.

Id. In that way, the competitor has captured the trademark holder's potential visitors or customers. Id.

Even if the consumer eventually becomes aware of the source's actual identity, or where no actual sale results, there is nonetheless damage to the trademark. This damage can manifest itself in three ways: (1) the original diversion of the prospective customer's interest to a source that he or she erroneously believes is authorized; (2) the potential consequent effect of that diversion on the customer's ultimate decision whether to purchase caused by an erroneous impression that two sources of a product may be associated; and (3) the initial credibility that the would-be buyer may accord to the infringer's products—customer consideration that otherwise may be unwarranted and that may be built on the strength of the protected mark, reputation and goodwill. See BigStar Entm't, Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185 (S.D.N.Y. 2000).

The federal courts, though not using the phrase "initial interest confusion," have acknowledged the potential for such confusion for decades. See, e.g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331 (2d Cir. 1975). Initial interest confusion in the internet context derives from the unauthorized use of trademarks to divert internet traffic, thereby capitalizing on a trademark holder's goodwill. See Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1018 (9th Cir. 2004) (holding that initial interest confusion

occurs when a defendant uses a plaintiff's trademark in a way calculated to capture a consumer's attention and divert the consumer to the defendant's own Web site), cert. denied, 125 S. Ct. 1825 (2005); Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1061-65 (9th Cir. 1999) (holding that the defendant's use of a trademark in a Web site's metatags allowed the defendant to benefit improperly from the goodwill associated with the mark); Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 814 (7th Cir. 2002) (affirming the grant of a preliminary injunction preventing the defendant from using the plaintiff's trademark as a metatag in the defendant's Web site); see also Gov't Employees Ins. Co. v. Google, Inc., 330 F. Supp. 2d 700, 701, 706 (E.D. Va. 2004) (holding that the auction of trademarked terms to the highest bidder states a cause of action under the Lanham Act).

In this case, as noted above, Defendants used Plaintiffs' trademarks on Defendants' Web sites. Defendants also placed Plaintiffs' trademarks in the metatags of Defendants' Web sites. Further, Defendants paid Overture.com to list Defendants in a preferred position whenever a computer user searched for Plaintiffs' trademarks. All of these actions were attempts to divert traffic to Defendants' Web sites. While viewing Defendants' Web sites, consumers had the opportunity to purchase Products, but also to purchase lotions from Plaintiffs' competitors. Moreover, Defendants continued to use the trademarks to divert

internet traffic to their Web sites even when they were not selling Products. Thus, Defendants used the goodwill associated with Plaintiffs' trademarks in such a way that consumers might be lured to the lotions from Plaintiffs' competitors. This is a violation of the Lanham Act.

We evaluate Plaintiffs' claim for initial interest confusion according to the six-prong test we announced in Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964 (10th Cir. 2002). We look at (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. Id. at 972. No one factor is dispositive, and likelihood of confusion is a question of fact. Id. at 972.

In this case, the degree of similarity of the marks weighed heavily in favor of Plaintiffs, since the trademarked terms were identical to the terms used by Defendants. The intent of the infringer in adopting the mark also weighed in favor of Plaintiffs. Here the Hatfields deliberately used the trademarks to drive internet traffic to their own Web sites, where they sold both Products and lotions from Plaintiffs' competitors.

Moreover, the similarity of products and manner of marketing weighed in favor of Plaintiffs. The trademarked terms were tanning-related, just like the

- 23 -

products offered on Defendants' website were.  Further, the degree of care likely to be exercised in purchasing Products weighed in favor of Plaintiffs because Plaintiffs' low-cost products were subject to impulse purchases.  See id. at 975.

Finally, the strength of the trademarks weighed in favor of Plaintiffs.  Approximately fifty to sixty percent of the tanning salons in the United States carry Plaintiffs' trademarked Products.  The substantial volume of sales of Products, both through Defendants' Web sites and through traditional salons, speaks to the strength of the trademarks.

However, Plaintiffs did not offer any direct evidence of actual confusion, so that factor weighs in favor of Defendants.  Moreover, Defendants attempted to prevent actual confusion by placing disclaimers on their Web sites—though because these disclaimers do not tie particular trademarks to particular holders, the disclaimers are inadequate.[7]  More importantly, "a defendant's website

---

[7]    A disclaimer on one of Defendants' Web sites provides:

COPYRIGHT © 2001 DiscountTanningLotion
All other copyrights and trademarks are the property of their respective owners.

DiscountTanningLotion and it's [sic] affiliated salons are independent distributors.  DiscountTanningLotion and it's [sic] affiliates are not associated with and do not represent any manufacturer or any distributor of any products displayed on it's [sic] Web sites.  We are a licensed salon promoting & advising on professional products for personal consumers.

(continued...)

disclaimer, proclaiming its real source and disavowing any connection with its competitor, cannot prevent the damage of initial interest confusion, which will already have been done by the misdirection of consumers looking for the plaintiff's websites." Buckman, 183 A.L.R. Fed. 553. In any event, even if this one factor does weigh in favor of Defendants, one factor alone is not dispositive of the likelihood of confusion. See Sally Beauty Co., 304 F.3d at 972.

Because the evidence at trial on likelihood of confusion did not point only in favor of Defendants, the district court did not err in denying Defendants' motion for judgment as a matter of law.

## B. The First Sale Doctrine

---

[7](...continued)
A disclaimer on another of Defendants' Web sites provides:

> AbetterTan.com, Quality Tanning and Distributing, L.L.C. and their affiliated tanning salons are not associated with, affiliated with nor do we represent any manufacturer or distributor of any products displayed on it's [sic] Web sites. AbetterTan.com, Quality Tanning and Distributing, L.L.C. and their affiliated tanning salons are not approved by nor authorized by any manufacturer or distributor to sell any of the products displayed on it's [sic] Web sites. . . .

> © Copyright 1999, 2000, 2001, 2002 AbetterTan.com, All rights reserved.
> All other copyrights and trade marks are the property of their respective owners.

Because in general "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product[,] [r]esale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." Sebastian Int'l, 53 F.3d at 1074. "It is the essence of the 'first sale' doctrine that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." Id. at 1076. "When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute." Id.

However, the first sale doctrine does not protect resellers who use other entities' trademarks to give the impression that they are favored or authorized dealers for a product when in fact they are not. See D 56, Inc. v. Berry's Inc., 955 F. Supp. 908, 910-20 (N.D. Ill. 1997) (addressing a defendant's use of a plaintiff's trademark and promotional materials in the defendant's store displays and advertising). In this case, Defendants' use of Plaintiffs' trademarks on the internet was such an act. Defendants' intentional use of Plaintiffs' trademarks on Defendants' Web sites, in the metatags for the Web sites, and with Overture.com constitutes more than merely displaying and stocking trademarked items. See Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 465 (7th Cir. 2000). Thus,

Defendants' actions were indicative of an intent to cause consumer confusion, and are not shielded by the first sale doctrine.  See id.

### C.    Damages for Lanham Act Claims

In order to recover damages on a Lanham Act claim, a "plaintiff must prove [that he or she] has been damaged by actual consumer confusion or deception resulting from the violation."  Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 525 (10th Cir. 1987).  "Actual consumer confusion may be shown by direct evidence, a diversion of sales or direct testimony from the public, or by circumstantial evidence such as consumer surveys."  Id.  "Although the quantum of damages . . . must be demonstrated with specificity, courts may engage in some degree of speculation in computing the amount of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing."  Id. (quotation omitted).

In this case, Australian Gold and ATS clearly suffered damages as a result of Defendants' actions.  Because Defendants sold Products over the internet, Australian Gold and ATS lost the opportunities for up-selling that came when Products were sold in salons by trained professionals.  Plaintiffs' trademarks were used to lure customers to Web sites that advertised their competitors' products.  Doubtless some consumers purchased those competitors' products, especially during the period that Products were not available on the Web sites.  Plaintiffs

faced the potential for lawsuits and diminution of Products' reputation as consumers bought Products over the internet without receiving instruction on which Products were the best fit for their needs or on how safely to apply the Products.

There is little evidence of the quantum of such damages in the record. However, here again Defendants have not challenged the amount of the verdict against them, so if a jury reasonably could have inferred based on the evidence presented at trial that Plaintiffs suffered any measurable amount of damages, then the district court did not err in submitting Plaintiffs' Lanham Act claims to the jury. See Elliot, 381 F.3d at 1005. Evidence of the value of Defendants' sales provides information from which a jury could have inferred Plaintiffs' damages. Evidence admitted at trial established that Defendants' sales of Products for the three months preceding trial were over $350,000, and that Defendants' overall sales in 2002 were more than $2 million. Thus, there was some evidence at trial of the value of Defendants' sales of Products and Defendants' sales of the lotions of Plaintiffs' competitors.

Evidence of the value of Defendants' sales of Products, together with evidence as to the price of those Products that was also admitted, provided some information from which a jury could determine the value of Plaintiffs' lost up-selling possibilities. The value of Defendants' sales of lotions from Plaintiffs'

competitors provides an upper boundary for the value of diverted sales. See Spinit Reel Co., 832 F.2d at 525. Though this is clearly a case in which some "degree of speculation" is necessary in computing the amount of damages, that fact is not enough to justify granting judgment as a matter of law to Defendants on Plaintiffs' Lanham Act claims, particularly since the need for speculation is attributable in part to Defendants' poor recordkeeping. See id.

Thus, Plaintiffs introduced some evidence at trial of the damages that they sustained as a result of Defendants' Lanham Act violations, making submission of the issue to the jury appropriate. None of Defendants' three contentions indicate that the district court erred in denying Defendants' motion for judgment as a matter of law on Plaintiffs' Lanham Act claims.

## IV. Injunctive Relief

We review a district court's decision to issue a permanent injunction for an abuse of discretion. Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1555 (10th Cir. 1996). Under this standard, we accept the district court's factual findings unless they are clearly erroneous and review the court's application of legal principles de novo. Id.

In this case, the district court's injunction states:

1.    Defendants . . . are enjoined from offering for sale, selling, advertising, distributing or marketing Plaintiffs' products via the Internet or to the general public, or violating the 2001 and

- 29 -

> 2002 Agreements or Subdistributorship Agreements in any other way.
>
> 2.  Defendants . . . are further enjoined from displaying any of the Plaintiffs' trademarks or names on the Internet, using any of Plaintiffs' names and trademarks in the html code or displaying any false or misleading statements on any of their websites.

Defendants argue that Plaintiffs had no right to an injunction on ETS's tortious interference claim or the trademark infringement claims of Australian Gold and Advanced Technology Systems. Defendants also argue that the injunction granted on the trademark infringement claims was overly broad, and that a disclaimer would adequately remedy any potential confusion. Neither of Defendants' contentions is meritorious.

## A.    Tortious Interference Claim

Under Oklahoma law, injunctive relief is not warranted where a plaintiff has a "plain, speedy, and adequate remedy at law." Powell Briscoe, Inc. v. Peters, 269 P.2d 787, 791 (Okla. 1954) (quotation omitted). However, in Bitterman v. Louisville & N.R. Co., 207 U.S. 205 (1907), the Supreme Court affirmed the issuance of an injunction restraining ticket brokers from dealing in nontransferable railroad tickets, despite the fact that the railroad could have taken action against the individuals who sold the nontransferable tickets to the brokers. The court noted:

The contention that . . . there was no right to resort to equity because there was a complete and adequate remedy at law to redress the threatened wrongs when committed is . . . devoid of merit. From the nature and character of the non-transferable tickets, the number of people to whom they were issued, the dealings of the defendants therein and their avowed purpose to continue such dealings in the future, the risk to result from mistakes in enforcing the forfeiture provision and the multiplicity of suits necessarily to be engendered if redress was sought at law, all establish the inadequacy of a legal remedy and the necessity for the intervention of equity.

Id. at 225. Bitterman makes clear that ETS's right under its agreements with its many distributors to terminate those relationships if the distributors violate the agreements—by, for example, selling Products to Defendants—does not provide ETS with a "plain, speedy, and adequate remedy." Thus, the district court did not abuse its discretion in imposing an injunction that addressed Defendants' tortious interference with contract.[8]

## B.    Lanham Act Claims

Under the Lanham Act, a district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent . . . a violation [of the Act]." 15 U.S.C. § 1116(a). Although courts have found disclaimers to be adequate alternatives to injunctions

---

[8]Defendants also argue that injunctive relief is inappropriate because the Final Pretrial Order does not contain a request by ETS that Defendants be enjoined from purchasing ETS products or interfering with ETS's distributor agreements. This argument is without merit. Plaintiffs' complaint contained a request for injunctive relief, and Plaintiffs reiterated their request after trial.

in certain cases, "each case must be judged by considering the circumstances of the relevant business and its consumers." Home Box Office, Inc. v. Showtime/The Movie Channel Inc., 832 F.2d 1311, 1315 (2d Cir. 1987). The proponent of a disclaimer bears a "heavy burden . . . to come forward with evidence sufficient to demonstrate that any proposed materials would significantly reduce the likelihood of consumer confusion." Id. at 1316.

In this case, Defendants have not shown that a disclaimer would be sufficient to alleviate the likelihood of confusion. See United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 142 (3d Cir. 1981). Rather, Defendants offer only conclusory allegations that "if there were any evidence of a likelihood of confusion, it could be remedied by a simple disclaimer." Moreover, even if a disclaimer were sufficient to prevent consumer confusion, such a disclaimer would not prevent Defendants from impermissibly using Plaintiffs' trademarks in Defendants' metatags and on Overture.com. Nor would the disclaimer prevent Defendants from capitalizing on consumers' initial interest confusion.

Thus, the district court did not err in entering an injunction in this case, and the scope of the injunction entered by the district court is not overly broad.

V.      Sanctions for Discovery Abuses

"Determination of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is best qualified to make." Ehrenhaus

v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992). Therefore we review a district court's decision whether or not to impose sanctions, as well as its choice of sanctions, for an abuse of discretion. See Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1182 (10th Cir. 1999).

During discovery in this case, Plaintiffs filed a motion to compel, seeking the disclosure of Defendants' suppliers for lotions other than Products. Defendants resisted, asserting a trade secret privilege. Plaintiffs sought sanctions against Defendants based on Defendants' non-disclosure of the supplier list and Defendants' non-disclosure of documents responsive to one of Plaintiffs' other discovery requests that Plaintiffs later found in Defendants' trash dumpster. After a hearing, the district court sanctioned Defendants, ordering them to pay approximately $27,000 in attorney's fees and costs incurred by Plaintiffs in prosecuting this and one other motion to compel.[9]

Defendants contend that the court erred in awarding Plaintiffs these fees and costs. Defendants argue that the documents that Defendants did not produce and that later were discovered by Plaintiffs were not within the scope of Plaintiffs' request for production. Defendants also assert that their list of suppliers was a privileged trade secret. Finally, Defendants argue that the amount

---

[9]The second motion to compel sought the production of tax records, which Defendants refused to produce voluntarily.

of attorney's fees awarded to Plaintiffs as a sanction was excessive because the hours for which Plaintiffs sought reimbursement were excessive. Defendants' contentions are without merit.

## A. Discarded Documents

Defendants conceded below that the documents found in their dumpster were responsive to Plaintiffs' requests for production. Specifically, Defendants stated that the documents were responsive, but merely reiterated information contained in other documents.[10] Defendants' decision not to disclose these documents is improper, for every responsive document must be disclosed, absent a timely objection. See Fed. R. Civ. P. 34(b). In such instances, Fed. R. Civ. P. 37 "mandates an award of expenses unless the court finds that an exception applies." Harolds Stores, Inc., 82 F.3d at 1555. No exceptions are applicable in the instant case. See Fed. R. Civ. P. 37. Thus, the district court's decision in this case to sanction Defendants the costs and expenses provided in Fed. R. Civ. P. 37(a)(4) does not constitute an abuse of discretion.

## B. List of Suppliers

Plaintiffs requested Defendants' list of suppliers in connection with ETS's

---

[10]To the extent that Defendants might argue that they did not concede below that the documents found in their dumpster were responsive to Plaintiffs' requests for production, that argument is without merit. Plaintiffs requested production of any and all documents relating to the sale of Products on Defendants' Web sites. The documents found in Defendants' dumpster "consist of daily transaction listings allowing Defendants to verify charge card debits and product shipment information for all products and items sold by Defendants . . . and the daily shipment detail report for all UPS shipments made by Defendants reflecting the charge for that UPS service." Thus, it is clear that the documents found in Defendants' dumpster related to the sale of products from Defendants' Web sites.

state-law claim for tortious interference with contract. Therefore, Oklahoma law governs the analysis of whether the trade secrets privilege applies to the list. See Fed. R. Evid. 501.

> The Oklahoma Uniform Trade Secrets Act defines "trade secret" as
>
> information including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> > a.  derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
> >
> > b.  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

78 Okla. Stat. § 86(4). Oklahoma has adopted six factors from the Restatement of Torts to help determine whether information is a trade secret: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. See Amoco Prod. Co. v. Lindley, 609 P.2d 733, 743 (Okla. 1980).

In this case, Defendants bear the burden of proof in establishing a trade secret. Id. Thus, in order to prove that their list of suppliers constituted a trade secret, Defendants had to establish that the list "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." However, the list sets out only a collection of suppliers whom any participant in the industry would presumably be able to access. Thus, the list contains information that is (1) widely known outside of Defendants' business; (2) presumably widely known by employees and others involved in the business, since many employees were involved in picking up products; and (3) easily acquired or duplicated by others. Thus, at least three of the factors used to determine whether a trade secret exists indicate that such a secret does not exist in this case. Therefore, the district court did not abuse its discretion in determining that the trade secrets privilege did not apply. Cf. Russ Stonier, Inc. v. Droz Wood Co., 52 F.R.D. 232, 233 (E.D. Pa. 1971) ("There is no absolute privilege protecting a manufacturer from disclosing his customer list and source of supply.").[11]

---

[11]Defendants' reliance on Brenner v. Stavinsky, 88 P.2d 613, 615 (Okla. 1939), for the proposition that a customer list is a trade secret is misplaced. Brenner addresses whether an employee who leaves a company may be enjoined from using that company's customer list for the purpose of taking business away

(continued...)

## C. Amount of Sanctions

Defendants argue that the district court's award of over $27,000 in attorney's fees and costs based on Plaintiffs' success in prosecuting two motions to compel was excessive. Specifically, Defendants argue that the district court erred because it did not reduce Plaintiffs' calculation of the amount of time spent preparing the motions, eliminate Plaintiffs' travel time, or write off duplicative time.

In its award of attorney's fees to Plaintiffs, the district court noted that "[t]he itemized description of labor in Plaintiffs' application significantly relates to both Motions to Compel, and . . . such hours were reasonably expended in light of the circumstances." Moreover, even though the district court approved all of the hours spent on the case, Plaintiffs reduced the amount of attorney's fees that they sought in this case by over $7,500—some 25%—to take account of the fact that the hourly rates of Plaintiffs' counsel are higher than the rates customarily charged by comparable professionals in Oklahoma City, and two out-of-town counsel attended the hearing on the motion to compel. Given this substantial adjustment, we cannot say that the district court abused its discretion by failing to reduce Plaintiffs' fees still further.

---

[11](...continued)
from his former employer, not whether a customer or supplier list constitutes a trade secret that should be privileged in litigation.

Thus, the district court did not abuse its discretion in deciding to impose sanctions for Defendants' discovery violations or in its choice of sanctions.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.[12]

---

[12]Throughout their briefs, Defendants criticize the jury instructions given by the district court, as well as the district court's rejection of certain alternative jury instructions proposed by Defendants. We have not analyzed those criticisms, because they are only mentioned in passing and are not argued. See Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994). Moreover, to the extent that Defendants' quarrels with the jury instructions stem from their wish to advance a different substantive view of the law—the same view represented by their motion for judgment as a matter of law—we have rejected that view of the law in this appeal. By extension, we have necessarily rejected Defendants' criticism of the jury instructions, for where the instructions, viewed as a whole, accurately state the law, they will not form a basis for relief on appeal. See Garrison v. Baker Hughes Oilfield Operations, Inc., 287 F.3d 955, 964 (10th Cir. 2002).