TYMKOVICH, Circuit Judge,
dissenting.
The two marks in this case are confusingly similar. Because the district court erred in its analysis of the Sally Beauty factors, I would find in favor of Vail Associates, Inc. and Vail Trademarks, Inc. (together “Vail Associates”) on the trademark infringement claim.
Trademark infringement under the Lan-ham Act results from “[t]he unauthorized use of ‘any reproduction, counterfeit, copy, or colorable imitation’ of a registered trademark in a way that ‘is likely to cause confusion’ in the marketplace concerning the source of the different products.” Australian Gold, Inc v. Hatfield, 436 F.3d 1228, 1238 (10th Cir.2006) (quoting 15 U.S.C. § 1114(1)). This protection against confusion concerning the source of a product or service also extends to confusion with regard to affiliation, connection, association, sponsorship, or approval. Lanham Act § 43(a), 15 U.S.C. § 1125.
*874 I agree with the majority that the district court properly identified the factors relevant to assessing the likelihood of consumer confusion. These factors are (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964, 972 (10th Cir.2002). But I conclude the district court erred in its analysis of these factors.
“A finding is clearly erroneous ‘when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’ ” Naimie v. Cytozyme Lab., Inc., 174 F.3d 1104, 1112 (10th Cir.1999) (quoting Anderson v. Bessemer City, 470 U.S. 564, 565, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). The assessment for clear error depends on the totality of the record, and the “court’s failure to weigh all of the relevant factors in determining likelihood of confusion constitutes reversible error.” Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 942 (10th Cir.1983). “At all times ... the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks.” Team Tires, 394 F.3d at 833 (internal quotations omitted).
After a thorough review of the record in light of the Sally Beauty factors, I am convinced Vail Associates met its burden of proving a likelihood of confusion. Because each Sally Beauty factor weighs in favor of Vail Associates, the district court should have found in its favor.

1. Similarity Between the Marks

“The degree oí similarity between marks rests on sight, sound, and meaning. This court must determine whether the allegedly infringing mark will confuse the public when singly presented.... ” Sally Beauty, 304 F.3d at 972.
The district court focused on several inquiries related to similarity and decided they weighed in favor of defendants Vend-Tel-Co., Ltd. and Eric A. Hanson (together “VTC”). First, the district court discussed the overall description of the VAIL mark, noting the mark does not exist in isolation but is often accompanied by a unique logo. While the logo is distinctive, in this case that is of little significance because the infringing use is a phone number and Vail Associates alleges infringement of the word mark alone. Second, the district court also noted the parties’ marks are visually distinct because phone numbers advertising Vail Associates’ products are 1-888 numbers, not 1-800 numbers. I do not consider this a major distinction.
The court’s primary conclusion with regard to similarity of sight, sound and meaning found the combination of “ski” and “Vail” was no more infringing than using VAIL by itself. “The word ‘ski’ is a ... verb, meaning to glide over snow.... The Vail Associates’ skiing facilities may be considered unique, but the activity of skiing is not uniquely available at their Vail resorts.... ” Aplt. App. 445. The district court’s analysis of this key factor erred by ignoring the overall meaning of VTC’s mark for the consumer. The majority notes Vail Associates’ VAIL mark is only one element of four in comparison to VTC’s 1-800-SKI-VAIL mark, but we judge the similarity between two marks “by the total impression created by the designations and not by a comparison of the individual features. Although individual features may be dissimilar, the total effect of the two designations may be similar.” Restatement (Third) of Unfair Competition § 21 cmt. c (1995) [Restatement], *875 “To the extent that the similarity of mental impression dominates over the dissimilarities in appearance, a likelihood of confusion may result.” Restatement § 21 cmt. f.
The other three elements of VTC’s mark only serve to emphasize the meaning for which Vail Associates trademarked VAIL. VTC’s inclusion of the term “ski” in an alphanumeric telephone number goes to the heart of Vail Associates’ business and creates a confusingly similar meaning. Contrary to the district court’s finding, the use of the word “ski” in this context does not simply describe the activity of gliding over snow. Instead, the word “ski” sets aside a perception that VTC’s services are generically associated with the geographic area of Vail and directly links VTC’s business in the consumer’s mind to the Vail Resort. Neither does the numerical prefix of VTC’s mark distinguish its meaning. The numbers simply indicate to the consumer that the mark is a means of contacting through a toll-free phone number the entity that offers skiing in Vail. Because only one ski resort exists in Vail, a consumer calling VTC can have only one thing in mind: skiing at the Vail Resort.[1]
Thus the additional elements of the 1-800-SKI-VAIL mark only serve to emphasize to the consumer the importance of VAIL, the portion of the mark that is identical in sight and sound to Vail Associates’ mark. The “sight, sound, and meaning” of 1-800-SKI-VAIL strongly suggests to typical consumers that they are accessing the services of Vail Associates.

2. Intent

“Proof that a defendant chose a mark with the intent of copying plaintiffs mark, standing alone, may justify an inference of confusing similarity.” Beer Nuts, 711 F.2d at 941 (internal citations omitted). The key inquiry “is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.” Jordache Enters, v. Hogg Wyld, Ltd., 828 F.2d 1482, 1485 (10th Cir.1987) (internal citations omitted). The district court concluded “[tjhere is nothing in this record to suggest that [VTC] had the intention of trading on the Vail Associates’ trademark or intended to deceive the public into believing that the marketing service was provided by Vail Associates or the owners and operators of Vail ski facilities.” Aplt. App. 447. The district court erred by failing to infer intent from the similarity of the marks and other evidence.
VTC by its own admission intended to procure telephone numbers that use “the name of a major ski resort or other marketable word.” Aplt. App. 924-25. By incorporating the name of Vail, a major ski *876 resort, into a toll-free telephone number, VTC hoped to capitalize on Vail Resort’s reputation as an attractive destination and provide people interested in visiting the resort with a means of contacting, not the resort, but businesses affiliated with VTC. “One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him.” Beer Nuts, 711 F.2d at 941. VTC clearly desired to trade on the name Vail as a ski destination, an inference supported by their use of a mark already established in the marketplace. See Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 928 (10th Cir.1986) (holding courts should infer intent from similar marks).
The only doubt about intent VTC raises is that the word “Vail” is a geographic place as well as the name of a famous ski resort. On the record, this doubt must be resolved against VTC because their phone number does not simply use “Vail” as a geographic descriptor. True, the success of VTC’s business depended on the ability to inform potential customers that they offered travel services for the Vail area.[2] But VTC’s use went a step too far by exploiting the combination of “ski” and “Vail” in their alphanumeric number. By doing so, they chose to tie their services to skiing at the Vail Resort.
The majority suggests the district court could have determined Vail Associates presented no evidence of intent based on the testimony of VTC’s expert on trademark law, who testified that “ski” and “Vail” are both generic terms, and VTC’s use of those terms provides no evidence of an intent to infringe on Vail Associates’ mark. The expert testified, “Well, skiing is kind of what people do in Vail. It is the main attraction.... I think that skiing of course is a generic term in the area. I mean, it’s what one does.” Aplt. App. 886-87. The expert’s testimony, however, ignores that when one skis in Vail, one skis at Vail Associates’ resort. The expert testified that he was not a skier, that he had only visited Vail in the summer, and that he was not aware whether one could ski in Vail other than through Vail Associates. Conversely, VTC’s intent to create confusion was directed at consumers seeking a ski vacation, people who would be far more familiar than VTC’s expert with the specific, non-generic meaning created by the combination of the words “ski” and ‘Wail.” See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:5 (4th ed. 1996) [McCarthy] (“A potential customer is one who might some day purchase this kind of product or service and pays attention to brands in that market. For example, in a case concerning similar marks used on recreational sailboats, the possible confusion of a per *877 son who has no interest in boats at all is not relevant.”)
The expert also testified VTC “us[ed the word “Vail”] as a way of telling people that his telephone marketing service relates to Vail, Colorado and environs.” Aplt. App. 875. But by adding the word “ski,” VTC informed consumers that their service related more specifically to skiing in Vail, not just to general services in the geographic region of Vail. By combining the terms “ski” and “Vail” in a phone number, VTC could only have intended to evoke the particular skiing experience at the only ski resort in Vail and named Vail. VTC confounds the obvious implication of the combined terms.
Furthermore, the record provides additional indications of intent. First, VTC attempted to sell the vanity number to Vail Associates, and Hanson testified he thought Vail Associates could increase their revenues by using the number, even though VTC was not able to make profitable use of it. These circumstances indicate VTC knew the vanity number took advantage of Vail Associates’ already established ski resort business.
Second, VTC represented in its application to the PTO that the mark was not descriptive but “appears calculated to convey to the average consumer that it is an identifier of a company’s services.” Aplt. App. 964. But the service the mark most obviously identifies is skiing in Vail. Hanson testified the mark was intended to identify a phone switching service: “We’re a conduit. There’s callers out over here on this side of the table. We’re the conduit through our phone switching system to get to this end over here.... What we sell is the conduit here.” Aplt. App. 850. But by choosing to identify the “conduit” service with the trademarked word VAIL and the ski activity for which VAIL is trademarked and famous, VTC created the impression of being a conduit to the entity that operates the ski resort at Vail. This, of course, is the source of customer confusion.
Third, in a letter to the PTO, VTC compared its mark to 1-800-FLY-SWA (for booking air transportation on Southwest Airlines) and 1-800-PICK-UPS (for scheduling pick-up and delivery of packages by United Parcel Service). The comparisons illustrate VTC’s intent because they each identify a general service and the specific provider of the service and provide a contact phone number for that specific provider. Southwest Airlines provides flights. United Parcel Service provides package pick up and delivery. But VTC does not provide skiing. Vail Associates does, and world-famous skiing at that.
Even if VTC’s subjective intent was benign, their vanity number, as it is currently used, has an overarching purpose of selling ski packages to Vail. Regardless of subjective intent, VTC directly competes with Vail Associates and capitalizes on the international reputation and marketing Vail Associates creates. See 4 McCarthy § 23:105 (noting the modern view that intent “is merely evidence relevant to whether confusion is likely,” and “good faith intentions of an infringer are no defense to a finding of liability”). The district court was not free to ignore the objective implication that 1-800-SKI-VAIL directly benefits from the reputation and mystique of the ski resort.[3] VTC is not relying on its *878 own goodwill and reputation; it is taking advantage of Vail Associates’ well-known ski resort business.

3. Evidence of Actual Confusion

“Although not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion.” Sally Beauty, 304 F.3d at 974. The district court found no such evidence, stating that “[t]he Vail Associates have not provided evidence of actual confusion in that they have not shown that persons calling 1-800-SKI-VAIL assume that they are going to be connected to the owners and operators of Vail ski facilities.” Aplt. App. 446. Rather, the district court interpreted the evidence as showing “that people calling that number are expecting to be connected to businesses that offer services associated with skiing in the Vail Valley area.” Aplt. App. 446. The district court erred with this interpretation of Vail Associates’ evidence.
At trial, Vail Associates offered the testimony of a travel consultant, Joyce Newton, who answered calls to the 1-800 number. She testified that, on a weekly basis, her company answered ten to twenty calls to 1-800-SKI-VAIL, and that these callers fit a very different profile than the callers who responded to her travel agency’s marketing. She stated that “more often than not, there were questions with regard to general ski related products, location questions.” [4] Aplt. App. 620 (emphasis added). She testified these questions included information about season passes, directions to Vail, weather, grooming, restaurants, and ski rental.
These questions directly relate to services provided by Vail Associates, not simply generically, as the district court found, to “businesses that offer services associated with skiing in the Vail Valley area.” In fact, when Newton’s business did not offer the service the caller was seeking, her agents directed the caller to Vail Associates, because these inquiries were not “a revenue product for us.” Aplt. App. 621. When a caller asked about grooming at Vail Ski Resort, Newton testified, “we would refer to one of the Vail Resort switchboards and just let them go ahead and route to the correct area.” Aplt. App. 621. When callers asked about season passes to Vail, which “happened quite often,” Newton’s agents would redirect the call to Vail Resorts. Aplt. App. 622. *879 Newton acknowledged only Vail Resorts provides season passes. This testimony shows callers contacted 1-800-SKI-VAIL seeking information from the operator of Vail Resort.[5]
Newton did testify on cross-examination that she frequently gets questions as a travel agent from clients about grooming and ski passes because of her business’s geographical location. But she also testified that callers to her travel agency asked such questions as a “question in a series of ... appropriate questions for our company and our product,” Aplt. App. 646, and that such questions were a “secondary or subsidiary type of question when getting into some atmospherically specific things about their vacation.” Aplt. App. 650.
Based on this testimony, the district court explains the calls to 1-800-SKI-VAIL requesting specific information about services provided by Vail Associates by concluding callers would ask these questions simply because they thought they were contacting some non-specific business geographically located in Vail. But people do not just call any business in Vail, even a travel agency, to obtain season pass, weather, and grooming information. Newton testified there was a “substantial” difference between the general information questions her travel agency customers asked and the questions callers to 1-800-SKI-VAIL asked. On the 1-800-SKI-VAIL line, “it had nothing to do with their vacation. It was directly about the grooming or the season passes.... That was all. That was their specific line of questioning.” Aplt. App. 650-51. People primarily seeking specific information about ski conditions or tickets would naturally try to call the ski resort. This is what callers to 1-800-SKI-VAIL did.
The district court addressed Newton’s testimony as indicating only “that requests for ski passes, lift tickets and other services provided by the plaintiffs were routed to the plaintiffs and there is nothing to indicate that any other responders to the number were diverted from the plaintiffs to competitive providers.”[6] Aplt. App. 447. But the record directly contradicts the court’s finding that callers were not diverted to competitive providers. Evidence of actual confusion can include initial interest confusion, which results when a prospective consumer of one product is *880 lured to a competing product by a similar trademark. See Australian Gold, 436 F.3d at 1238. “Even though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor. In that way, the competitor has captured the trademark holder’s potential visitors or customers.” Australian Gold, 436 F.3d at 1238-39.
Newton testified that “on occasion, [callers to 1-800-SKI-VAIL] suited our marketing plan” for travel services, including lodging. Aplt. App. 620. She also testified that her company booked rooms and properties not affiliated with Vail Associates. As Newton’s testimony shows, even if callers were referred to Vail Associates for ski conditions or pass information, those callers who sought accommodation packages were not. Because a significant aspect of Vail Associates’ ski business is hotel and condominium packages, 1-800-SKI-VAIL competed directly with Vail Associates in this regard, and Vail Associates presented evidence that consumers who were trying to contact the operator of Vail Resort and who were seeking accommodations were instead diverted to competitors.[7]
The record thus shows that the district court ignored evidence indicating consumers called 1-800-SKI-VAIL attempting to contact the operator of Vail Ski Resort and that callers seeking accommodation packages were diverted to Vail Associates’ competitors. While Newton did not receive a large volume of calls to the 1-800-SKI-VAIL number, she testified that “more often than not” those callers were seeking information that would normally be provided by the operator of Vail Ski Resort. Accordingly, the district court’s finding that Vail Associates presented no evidence of actual confusion was erroneous.
A Similarity of the Products and Manner of Marketing
The district court found the use of the 1-800-SKI-VAIL is limited to “marketing services providing a conduit between the caller and providers of lodging, restaurants, and other business services associated with skiing in the Vail area. There is nothing in that use to suggest that this is a service provided by the owners and operators of the Vail ski facilities.” Aplt. App. 446. This finding ignores the overlapping nature of the parties’ businesses and fails to acknowledge that the parties appeal to exactly the same class of consumers.
Naturally, “[cjonfusing similarity is most likely when the products themselves are very similar.” Beer Nuts, 711 F.2d at 941 (internal quotations and citations omitted); see Universal Money Ctrs. v. AT & T, 22 F.3d 1527, 1532 (10th Cir.1994) (“The greater the similarity between the products and services, the greater the likelihood of confusion.”). VTC’s marketing of a phone number does not mean they were marketing a different service than Vail Associates. VTC held out 1-800-SKI-VAIL as a means of accessing the same ski resort services offered by Vail Associates. In its current use as a telephone connection to a travel agency, 1-800-SKI-VAIL competes with Vail Associates’ ski resort lodging business and potentially disparages the quality of accommodations Vail Associates offers. VTC’s own expert acknowledged that 1-800-SKI-VAIL competes with Vail Associates’ ski resort lodging.[8]
*881 The district court also erred by failing to acknowledge that the parties appeal to the same class of consumers — people seeking a ski vacation in Vail. “If similar marks are used on goods or services that are marketed to the same prospective purchasers, the likelihood of confusion is greater than if there are few common purchasers.” Restatement § 21 cmt. g; see Dieter v. B & H Indus., Inc., 880 F.2d 322, 327 (11th Cir.1989) (finding likelihood of confusion when customers were similar but marketing strategies were dissimilar); cf. Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 557 (10th Cir.1998) (concluding there was little likelihood of confusion when the parties “operate[d] in distinctly different markets, [sold] distinctly different products, and contacted], for the most part, very different people in their marketing efforts”). Given the similarity of the marks, the congruency of the target audience in this case strongly indicates a likelihood of confusion.
Because VTC markets an overlapping product to the same pool of consumers as Vail Associates, VTC’s use of a mark virtually identical to Vail Associates’ can only suggest to the typical consumer that 1-800-SKI-VAIL is affiliated with Vail Associates’ ski resort business. By “promoting] the alphanumeric translation of [a] phone number, [VTC] caus[ed] the public to see the protected mark and associate the infringer’s goods or services with those of the mark holder.” DaimlerChrysler AG v. Bloom, 315 F.3d 932, 939 (8th Cir.2003); see also Holiday Inns v. 800 Reservation, 86 F.3d 619 (6th Cir.1996). VTC used the phone number to create an association in consumers’ minds with the famous ski resort and then sold consumers services in competition with that resort.

5. Degree of Care Likely to be Exercised by Purchasers

The consumer’s sophistication or degree of care is relevant because we assume a sophisticated consumer exercising a high degree of care at the time of a product’s purchase is less likely to be confused. Sally Beauty, 304 F.3d at 975. Although VTC concedes the district court did not expressly consider this factor, they argue this factor is not critical because we are concerned only with the degree of care at the time of purchase, and a customer purchases a package from 1-800-SKI-VAIL only after hearing a message disclaiming any affiliation with Vail Associates. VTC’s argument is unpersuasive because the disclaimer does not alleviate the confusion problem, even among sophisticated consumers.
Our cases have recognized that consumers purchasing higher cost items are likely to exercise more care, and a ski vacation is an expensive luxury item many consumers will plan carefully. See Sally Beauty, 304 F.3d at 975; Beer Nuts, 711 F.2d at 941. Nonetheless, people simply exploring ski vacation options will not exercise such extraordinary care when simply dialing a toll-free number, as VTC’s expert testified. VTC’s service therefore attracts consumers at both ends of the degree of care spectrum. But all potential customers, no matter the degree of care being exercised, *882 may experience initial interest confusion if the consumer “seeks a particular trademark holder’s product and instead is lured to the product of a competitor by the competitor’s use of the same or a similar mark.” Australian Gold, 436 F.3d at 1238. Even though initial confusion is dispelled, the consumer may stay with the competitor.
A disclaimer does not alleviate the damage wrought by initial interest confusion. See id. at 1240 (applying this principle to web sites). Here, a typical consumer seeking a ski vacation in Vail is likely to call 1-800-SKI-VAIL seeking information, accommodations, or a complete ski package. Whether the caller is an unsophisticated consumer simply gathering information or a sophisticated consumer who is ready to book an expensive ski vacation, VTC has obtained a major advantage over Vail Associates in selling its accommodation services if the consumer dials 1-800-SKI-VAIL hoping to contact the operator of Vail Resort, disclaimer notwithstanding. Vail Associates will never see those consumers who thought they were calling the resort or were interested in a complete package of lift tickets and accommodations offered by Vail Associates.

6. Strength of the Mark

Finally, I consider the strength of VAIL as a word mark. Trademarks are categorized according to their relative strength. The stronger the mark, the more likely the confusion. Sally Beauty, 304 F.3d at 975. In ascending order of strength, the categories are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. Id.[9] A “descriptive mark identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients.” Id. at 976.
VAIL is a descriptive mark because it also refers to the geographic location of the Town of Vail and the Vail Valley region west of Vail Pass. Accordingly, its strength depends on whether it has acquired a secondary meaning distinctive of the location. See Donchez v. Coots Brewing Co., 392 F.3d 1211, 1216 (10th Cir.2004); see also 2 McCarthy § 14:1 (noting that “descriptive geographical terms are in the ‘public domain’ in the sense that every seller should have the right to inform customers of the geographical origin of his goods. Therefore, a seller must build up goodwill and consumer recognition in a descriptive geographical term in order to have a legally protectable interest, and take the term out of the public domain”).
“Secondary meaning exists only if most consumers have come to think of the word as not descriptive at all but as the name of the product [or service].” Donchez, 392 F.3d at 1218; see Retail Servs. v. Freebies Publ’g, 364 F.3d 535, 539 (4th Cir.2004) (“Saying that a trademark has acquired ‘secondary meaning’ is shorthand for saying that a descriptive mark has become sufficiently distinctive to establish ‘a mental association in buyers’ minds between the alleged mark and a single source of the *883 product.’ ”) (quoting 2 McCarthy § 15:5) (emphasis in original). A geographically descriptive term, like all other descriptive terms, acquires a secondary meaning when prospective purchasers come to associate the term with a particular source, even if the purchaser cannot identify that source. Restatement § 13 cmt. e. Thus,- a consumer need not recognize that a particular company, or any company at all, operates the ski runs at Vail; a consumer need only associate VAIL with that particular skiing experience.
Here, the district court found that “[a]s an identifier of the services for which [VAIL] was registered, the word mark is weak and is more descriptive of a geographical location at which those services are provided rather than for the services themselves.” Aplt. App. 446. The evidence does not support this conclusion. VAIL is a descriptive term that has acquired a secondary meaning — world-class ski resort services. VTC’s own expert testified VAIL is a strong mark “[i]n the specific context of ski resort services, the services for which it’s registered and for which it’s widely known.” Aplt. App. 874. The expert later testified the commercial strength of the VAIL mark is “probably world renowned.” Aplt. App. 882. Vail Associates presented testimony that Ski Magazine has ranked Vail the number one ski resort in thirteen of the last seventeen years. This renown is backed by substantial marketing efforts: $13 million in 2003, and over $100 million since the VAIL mark was registered in 1989.[10]
Of course the context of ski resort services for which Vail Associates has invested in its world-renowned mark is the very context in which VTC used the VAIL mark — they inserted the word ‘Vail” into a phone number associated with skiing. This is not a case, like the expert described, of “Ford taken out of ... the automotive context, Ford bubble gum, Ford modelling [sic] agency.” Aplt. App. 875. VTC did not take VAIL out of the ski resort services context; instead, they emphasized that context with their choice of mark.
The district court erred by deeming the mark weak simply because Vail is also a geographic location. That a mark is geographically descriptive is “not conclusive of ‘strength’ ... since the issue ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source. Thus, a descriptive mark through vigorous promotion can become a strong mark.” Restatement § 21 cmt. I. Vail Associates has created a strong mark for skiing resort services. Because of those efforts, the word “Vail” conjures a mental association with those services in buyers’ minds. And the record shows that Vail Associates vigorously promotes the trademark and vigorously protects it when used in connection with skiing in Vail. The mere fact that Vail is also a geographical location does not prevent Vail Associates from creating a strong mark when “Vail” is associated with skiing.
As further indication that the VAIL mark is not merely descriptive, VTC does not simply use the word ‘Vail” as a descriptive term — they are using it to lure *884 customers based on the reputation of the Vail Resort for skiing. VTC juxtaposes the words “ski” and “Vail” in their alphanumeric number to suggest ski resort services, which they provide in competition with Vail Associates. This use of the name ‘Vail” is quite distinct from the many businesses in the Vail area that incorporate Vail as a geographical location in their business name.[11]
Finally, that Vail Associates’ mark has become incontestable — by virtue of its registration for over five years — is further indication of its strength. The parties concede and the district court found that Vail Associates’ word trademark became incontestable under 15 U.S.C. § 1065 in 1995. “An ‘incontestable’ mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning.” Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 924 (10th Cir.1986); see also Dieter, 880 F.2d at 329 (holding that an incontestable mark “is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark”).
Although Vail Associates presented evidence of secondary meaning and need not rely on such a presumption, the incontestability of the VAIL mark only adds to the weight of this factor in its favor. The district court’s cursory conclusion that Vail Associates’ mark was weak was clear error based on the evidence.
In sum, the totality of the factors strongly confirms that VTC’s mark is likely to cause consumer confusion. Accordingly, I would conclude the district court erred in finding that VTC’s vanity number does not infringe upon the Vail Associates’ trademark. Because the district court’s conclusions with regard to the Trademark Cancellation and False Designation of Origin claims both depended on its finding of no likelihood of confusion, I would remand those claims for further consideration.
I therefore dissent.

. The majority suggests I presuppose critical facts: (1) consumers calling 1-800-SKI-VAIL know that only one ski resort exists in Vail, and (2) those same consumers know the word Vail means that ski resort. But when determining the likelihood of confusion, we consider "the characteristics of the prospective purchasers of the goods or services.” Restatement § 21(c). Specifically, we consider "hypothetical purchasers operating in the market context in which the designations are used.” Restatement § 20 cmt. g. In the market context at issue, people calling 1-800-SKI-VAIL must be sufficiently interested in skiing to be considering a ski vacation. Not even VTC suggests a typical consumer would call 1-800-SKI-VAIL to organize a spelunking expedition near Colorado Springs, though that is evidently one of the options the 1-800-SKI-VAIL service offered at one time. Given the evidence Vail associates presented — including Vail’s prestige in Ski Magazine resort rankings, Vail Associates' extensive marketing efforts, and the acknowledgment by VTC’s expert that Vail is a world-renowned ski resort — a typical caller would only dial 1-800-SKI-VAIL because they were interested in skiing at the famous resort called Vail. Aplt. App. 466, 480.

. It is nevertheless worth noting that VTC’s use of "Vail” is not like the numerous businesses actually located in Vail that use the word as a descriptor of the business's geographic location. At various times, the 1-800-SKI-VAIL number was routed to travel agencies not in Vail or the Vail Valley, but in Winter Park, Colorado and in California, although the service was also at various times answered by a travel agency in Vail and the Vail Valley Tourism and Convention Bureau. Furthermore, a directory of services offered through 1-800-SKI-VAIL included advertisements for many services far flung from the Vail Valley, including Cave of the Winds, an attraction located near Colorado Springs, Colorado; Ski Sunlight, a ski area in Glenwood Springs, Colorado; and Bighorn Development, a real-estate company in Fort Collins, Colorado. Although the parties do not raise this issue, I note terms that are deceptively misdescriptive of geographic location are not entitled to trademark protection. Lanham Act § 2(e), 15 U.S.C. § 1052(e).

. As evidence that VTC did not intend to trade on Vail Associates' reputation, the district court cited a recorded message callers received at some point during the life of 1-800-SKI-VAIL disclaiming any relationship with Vail Associates. As I note below, the disclaimer does not absolve VTC of any intent to lure customers through initial interest confusion. The majority would further support the district court’s finding with (1) Hanson’s self- *878 serving testimony that he did not intend the obvious effect of the trademark he chose and (2) VTC's expert testimony that the terms "ski'’ and "Vail” are generic terms, testimony which ignores the effect of combining the words. This evidence that VTC lacked intent is marginal compared with the strong inference of intent created by VTC's choice of mark. See Beer Nuts, 805 F.2d at 928.

. The majority suggests the district court did not clearly err in finding no evidence of actual confusion because "[pjrobable confusion cannot be shown by pointing out that at someplace, at sometime, someone made a false identification.” Op. at 864 (citing King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1092 (10th Cir.1999) and 4 McCarthy § 23:14). The evidence, however, shows the majority of ten to twenty callers each week to 1-800-SKI-VAIL were specifically seeking information about skiing at Vail Resort. "Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence.” 4 McCarthy § 23:14. Newton was receiving only ten to twenty calls a week on the 1-800-SKI-VAIL line, and she testified the number was not being advertised, so the opportunities for confusion were relatively few. That ten to twenty callers per week dialed the 1-800-SKI-VAIL and the majority of those callers specifically asked questions directed at Vail Associates' ski resort business is significant evidence of actual confusion.

. The majority makes much of the changes Newton made to an affidavit prepared for her by a representative of Vail Associates. Newton in essence revised the affidavit to indicate that callers did not directly communicate to her that they were trying to reach Vail Associates. Newton added to her affidavit, "In my opinion, most people can’t necessarily identify a specific company with the purchase of their ski vacation products. They are familiar with [a] place to ski, as a place, not a company.” Supp. App. 74.
But to show evidence of actual confusion, Vail Associates does not need to show callers were trying to reach a particular company. Rather, Vail Associates must demonstrate callers were trying to reach a particular source of services.
Although trademarks serve to identify goods or services that share a common source or sponsor, the identity of the source or sponsor may remain anonymous. Il is universally recognized that a likelihood of confusion sufficient to establish infringement may exist regardless of whether prospective purchasers know the specific identity of the trademark owner.
Restatement § 20 cmt. d.
The calls Newton received, including calls requesting season passes and grooming reports, demonstrate that callers were attempting to contact the only place for skiing in Vail, a resort operation that happens to be run by Vail Associates. That callers did not or could not specifically identify an entity they were attempting to contact is immaterial to the evidence of actual confusion.

. This statement conflicts with the district court’s finding that there was no evidence of actual confusion.

. The majority acknowledges that 1-800-SKI-VAIL "provides easy access to [Vail Associates’] actual service competitors.” Op. at 873.

. The history of 1-800-SKI-VAIL also indicates that VTC’s relationship with Vail Associates may have been less than “symbiotic,” as VTC’s expert testified. Aplt. App. 882. Cer *881 tainly, people calling 1-800-SKI-VAIL are predisposed to visit the area and ski at the Vail resort, but the service could draw people to competing areas as well. First, as a connection to a travel agency, 1-800-SKI-VAIL offers travel services outside the Vail area; second, the phone number's initial incarnation as a directory service competed with Vail Associates not only on lodging, but the printed 1-800-SKI-VAIL directory included an advertisement for a competing ski resort; and third, callers at one point could also access, among other things, information on Cave of the Winds, an attraction near Colorado Springs that would take callers away from the Vail area entirely.

. Generic marks refer to “a general class of goods, such as 'cola,' of which an individual article is but a member.” Sally Beauty, 304 F.3d at 976. Because a generic mark does not specify the origin of a product, it is not entitled to trademark protection. Unlike generic and descriptive marks, suggestive, fanciful, and arbitrary marks are inherently distinctive and therefore do not need proof of secondary meaning. Suggestive marks do not directly describe a product, but instead suggest a product, requiring "the consumer to use imagination and perception to determine the product’s nature.” Id. Arbitrary marks are similar, using only "common words, symbols, and pictures that do not suggest or describe any quality or characteristic of the goods or services.” Id. Fanciful marks are words coined for the express purpose of acting as a trademark. Id.

. Vail Associates spent $10 million in 2003 marketing Vail Mountain in conjunction with its other resorts and $3 million marketing Vail in isolation. The majority and the district court discount Vail Associates' efforts to promote its mark because in print advertisements the word "Vail” is usually accompanied by a stylized logo. But VTC presented their mark as a phone number, in defendant Hanson's words, a “conduit” for contacting a service by telephone. A consumer would not expect to encounter a stylized logo in the presentation of a telephone number.

. The record also shows that Vail Associates does not contest the geographically descriptive uses of the word Vail in numerous local businesses, such as "Vail Limo,” Aplt. App. 695, "Vail Daily,” Aplt. App. 690, “Vail Valley Music Festival,” Aplt. App. 691, and "Vail Golf Club,” Aplt. App. 698. This belies the district court's fear that "[t]o grant the protections claimed by the plaintiffs in this case would create a monopolistic empire requiring that anyone who offers any type of service to connect the public with recreation activities in the Vail Valley must first seek a license or permission from the plaintiffs before they can proceed.” Aplt. App. 447. The strength of the VAIL mark lies in ski resort services, and 1-800-SKI-VAIL creates consumer confusion only because it suggests a means of accessing those services for which Vail Associates has promoted its mark rather than the geographical location of a particular business. Contrary to the district court's suggestion, the record does not show that the VAIL mark has been asserted in an overbroad or overreaching manner.